**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TRANS-TEC ASIA,
        *Plaintiff-Appellant,*

    v.

M/V HARMONY CONTAINER, its
freights engines apparel and
tackle; SPLENDID SHIPPING
SENDIRIAN BERHAD; MASTER OF THE
M/V HARMONY CONTAINER,
        *Defendants-Appellees.*

No. 06-55355

D.C. No.
CV-04-01160-SVW

---

TRANS-TEC ASIA,
        *Plaintiff-Appellee,*

    v.

M/V HARMONY CONTAINER, its
freights engines apparel and
tackle; SPLENDID SHIPPING
SENDIRIAN BERHAD,
        *Defendants-Appellants,*

        and

MASTER OF THE M/V HARMONY
CONTAINER.
        *Defendant.*

No. 06-55397

D.C. No.
CV-04-01160-SVW

OPINION

Appeals from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
October 16, 2007—Pasadena, California

2253

Filed March 11, 2008

Before: Alex Kozinski, Chief Judge, A. Wallace Tashima
and M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

J. Stephen Simms, Simms Showers LLP, Baltimore, Maryland, for the appellant.

Gerald L. Gorman, Bradley M. Rose, Kaye Rose & Partners, LLP, San Diego, California, for the appellee.

## OPINION

McKEOWN, Circuit Judge:

Like many maritime cases, this case involves a foreign-flagged vessel that sailed in and out of United States ports. And, like many maritime cases, because of the geographic scope of the high seas,[1] United States law may, in some cases, be applicable to transactions beyond our country's territorial waters and borders. And, like many maritime cases, the suit here arose against the vessel while it was docked in a United States port. The question we consider is whether a foreign supplier, by supplying fuel to a foreign-flagged vessel in a foreign port under an agreement that United States law applied to the transaction, may obtain a maritime lien under the Federal Maritime Lien Act, 46 U.S.C. § 31301 *et seq.*

---

[1]The "high seas" is generally defined as "the seas or oceans beyond the jurisdiction of any country." *Black's Law Dictionary* 1376 (8th ed. 2004).

("FMLA"), on the vessel docked in an American port. The district court granted summary judgment in favor of the vessel and its owner and against the fuel provider, holding that the FMLA did not permit a foreign necessaries provider to obtain a maritime lien under the circumstances. Based on the plain language of the statute, coupled with an enforceable choice of law clause, we conclude that a maritime lien arose under the FMLA, and we reverse.

## BACKGROUND

Splendid Shipping Sendirian Berhad ("Splendid")[2] is a Malaysian corporation that owns the M/V *Harmony Container* ("*Harmony*"), a Malaysian-flagged vessel. In June 2000, Splendid entered into a charter-party with Kien Hung Shipping Company ("Kien Hung") for a ten-year charter of the *Harmony*. Kien Hung, a Taiwanese corporation, operated the *Harmony* in a loop from ports in North and South America to ports in Japan, China, and Korea. In particular, the *Harmony* made regular stops at Long Beach, California, and Manzanillo, Mexico.

In early February 2003, one of Kien Hung's managers sought a price quote for fuel bunkers. The manager contacted an agent at Yee Foo Marine Industrial Co. Ltd. ("Yee Foo"), who requested a price quote from Trans-Tec Asia ("Trans-Tec"), a Singaporean entity. An employee for Trans-Tec faxed a quote to the Yee Foo agent, who forwarded the quote to Kien Hung. The Kien Hung manager then faxed back an order to the Yee Foo agent, who forwarded the order to Trans-Tec. In response, Trans-Tec sent a one-page email confirmation ("Bunker Confirmation") to Yee Foo for the sale of 1150 metric tons of fuel bunkers to be supplied to the *Harmony* at a cost of U.S. $251,850. The Yee Foo agent then forwarded

---

[2]In the parties' briefs, Splendid's name is listed as "Splendid Shipping Sendirian Berhad," though other documents, such as the district court's orders, used "Berhard."

the Bunker Confirmation to Kien Hung, which did not respond.

The Bunker Confirmation named "Kien Hung Shipping Co. Ltd." and "The Vsl, Her Master and Owners" as "Buyer," and Trans-Tec as "Seller." It provided that "[t]his confirmation incorporates Seller's standard terms and conditions dated 3 January 2000. Pls inform us if you require a copy." Kien Hung did not request a copy.

Trans-Tec's standard terms and conditions are included in a document entitled "The Trans-Tec Services Group of Companies General Terms and Conditions" ("Terms and Conditions"). The Terms and Conditions state that "the General Terms shall apply to every sale of marine petroleum products ('Products') entered into between a particular Trans-Tec Group company as seller ('Seller') and any buyer of such Products ('Buyer')."

The Terms and Conditions also contained an incorporation and merger clause ("The Confirmation and the General Terms . . . taken together, shall constitute the full agreement . . . ."), and, particularly pertinent here, a choice of law clause, which stated:

> Seller shall be entitled to assert its lien or attachment in any country where it finds the vessel. Each Transaction shall be governed by the laws of the United States and the State of Florida, without reference to any conflict of laws rules. The laws of the United States shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action.

Trans-Tec delivered the bunkers to the *Harmony* in Busan, South Korea, in late February 2003. In May 2003, Kien Hung went bankrupt, and Trans-Tec was left unpaid for the bunkers. Hamburg Sud, a German company, bought Kien Hung's oper-

ations, took over the *Harmony*'s charter, and continued sailing the vessel to Long Beach, California. Trans-Tec threatened to arrest the *Harmony* once it arrived at Long Beach, but the vessel's insurers posted security to avoid taking the ship out of operation.

Trans-Tec filed suit in federal court in Los Angeles, asserting a maritime claim in contract and in tort against the *Harmony*, a maritime claim in contract against Splendid, a claim for unjust enrichment against Splendid, and maritime attachment and garnishment of the *Harmony* and its bunkers.[3] The district court chose to resolve the dispute in stages. Realizing that the choice of law issue was the foundational building block, the court first invited the parties to brief only this issue with respect to Trans-Tec's claims regarding a maritime lien and unjust enrichment. The court then decided that, under United States law, the choice of law provision was not incorporated as a term of the contract, Splendid was not bound as a party to the contract, and Malaysian law governed the contract.

In a later order granting partial summary judgment to Splendid on its unjust enrichment claim, the district court informed the parties that it would reconsider its prior decision that United States law determined incorporation of the choice of law clause. The court ultimately granted summary judgment against Trans-Tec on the grounds that: (1) Malaysian law, not United States law, governed contract formation; (2) under Malaysian law, the United States choice of law clause was incorporated as a term of the contract; and (3) Trans-Tec could not obtain a maritime lien on the *Harmony* because United States law denied maritime liens to foreign necessaries

---

[3]Trans-Tec ultimately dropped its tort claim for conversion against the *Harmony*. It also made a *quasi in rem* claim against Splendid for maritime attachment and garnishment of the *Harmony* under Supplemental Rule B for Certain Admiralty and Maritime Claims. That claim was among those dismissed and is not part of the appeal.

providers servicing foreign-flagged ships in foreign ports. Trans-Tec now appeals this decision, and Splendid cross-appeals on the basis that the district court should not have applied the United States choice of law provision to the transaction in any respect.

During the back-and-forth flurry of summary judgment motions, Trans-Tec filed an affidavit in which it expressed a need to conduct discovery to establish that Splendid was a party to the contract and that Splendid had participated in the bunker contract. The district court construed Trans-Tec's affidavit as a motion for additional time to conduct discovery under Federal Rule of Civil Procedure 56(f), denied the motion, and later denied Trans-Tec's motion to reconsider its ruling.

## ANALYSIS

Trans-Tec's Terms and Conditions included a choice of law provision that designated United States law as governing the existence of a maritime lien. That designation is particularly significant because the United States is one of a handful of countries that recognizes a maritime lien for the provision of necessaries.[4] 46 U.S.C. § 31342; WILLIAM TETLEY, MARITIME LIENS AND CLAIMS 551 (2d ed. 1998) ("TETLEY"). Splendid's first line of defense is that the choice of law clause was not a part of the contract between Trans-Tec and Kien Hung. Alternatively, Splendid urges that the maritime lien does not apply to the provision of necessaries by a foreign provider. Our resolution of this appeal proceeds in three steps:[5] (1) we

---

[4]Fewer than thirty countries, among them the United States and France, recognize such a lien. *See* TETLEY at 551 (stating that maritime liens arise only in the United States, France, and those nations that signed on to the 1926 Brussels Convention, which provides a maritime lien for necessaries under limited circumstances).

[5]We review de novo both the district court's grant of summary judgment and the legal question whether Trans-Tec's claims give rise to a maritime lien. *Myers v. Am. Triumph F/V*, 260 F.3d 1067, 1069 (9th Cir. 2001).

determine the governing law with respect to contract formation; (2) applying the controlling law, we next determine whether the contract incorporates the choice of law provision; and (3) finally, if the choice of law provision is incorporated as a term of the contract, we evaluate whether Trans-Tec acquired a maritime lien for supplying fuel bunkers to the *Harmony*.

## I. DETERMINING THE LAW GOVERNING CONTRACT FORMATION

**[1]** Before we can determine the validity of the United States choice of law provision in the contract between Trans-Tec and Kien Hung, we need to figure out which country's law controls the issue of contract formation. Because the availability of a maritime lien under United States law is the ultimate question, the temptation is to skip directly to United States law, as urged by Trans-Tec. That approach, however, "put[s] the barge before the tug." *See DeNicola v. Cunard Line, Ltd.*, 642 F.2d 5, 7 n.2 (1st Cir. 1981). Instead, we consider which country's law governs the incorporation issue as if there were no choice of law clause. In other words, we cannot rely on the choice of law provision until we have decided, as a matter of law, that such a provision was a valid contractual term and was legitimately incorporated into the parties' contract.

**[2]** Both Supreme Court and Ninth Circuit law direct our analysis. We are guided by the principle that "[i]n the absence of a contractual choice-of-law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen*, 345 U.S. 571 (1953), and its progeny." *Chan v. Soc'y Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997) (citations omitted).

In *Lauritzen*, the Supreme Court identified seven factors "which, alone or in combination, are generally conceded to

influence choice of law to govern a tort claim":[6] (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance of the injured party; (4) the allegiance of the defendant ship-owner; (5) the place of contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum. 345 U.S. at 583-92. We have added that courts should weigh and evaluate all relevant points of contact between the transaction and the sovereign legal systems that are affected by it, and not simply run through a mechanical analysis of the *Lauritzen* factors. *Tento*, 694 F.2d at 1194-95. Accordingly, we also consider factors that § 188 of the Restatement identifies as relevant where a contract lacks a choice of law provision, such as the place of negotiation of the contract, the place of performance and the place of business of the parties. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971); *Gulf Trading & Transp. Co. v. The Vessel Hoegh Shield*, 658 F.2d 363, 366-67 (5th Cir. Unit A Oct. 1981) (discussing § 188 factors where there was no choice of law clause).

[3] In weighing all the points of contact implicated by the transaction, including the factors set out in *Lauritzen* and the Restatement, we agree with the district court's conclusion that under maritime conflicts of law principles, Malaysian law governed the contract formation. Splendid's nationality and the *Harmony*'s flag are "substantial contacts" with Malaysia that point towards Malaysian law "as the most appropriate for resolving this litigation." *Tento*, 694 F.2d at 1196. No sovereign other than Malaysia boasts such substantial contacts. That the bunkers were supplied in Busan, South Korea, "was dictated in large part by the fortuity of the ship's location and intended route." *Id.* at 1195. Deciding which country consti-

---

[6]Although *Lauritzen* dealt with tort claims under the Jones Act, the "Supreme Court has extended the *Lauritzen* approach to 'guide courts in the application of maritime law generally.' " *Gulf Trading & Transp. Co. v. The M/V Tento*, 694 F.2d 1191, 1193 (9th Cir. 1982) (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959) (citations omitted)).

tuted the "place of contract" or the place where negotiation of the contract occurred is a thorny inquiry, and does not weigh in favor of applying any one sovereign's law, as the bunker contract was formed through a series of emails and facsimiles sent by Trans-Tec and Kien Hung through Yee Foo, Trans-Tec's Taiwanese intermediary, at a time when the *Harmony* was docked in Hong Kong. To be sure, the Singaporean nationality of Trans-Tec, the "injured party," is a relevant point of contact. However, standing alone, it fails to outweigh the nature and quality of the Malaysian contacts: the *Harmony*'s Malaysian flag and Splendid's Malaysian nationality.

## II.    APPLYING MALAYSIAN LAW TO CONTRACT FORMATION

Malaysian law, which relies heavily on English law,[7] instructs us to examine the parties' language and conduct in determining whether the parties intended to incorporate the Terms and Conditions into their contract, even though no copy of that document was exchanged in the flurry of emails and faxes that preceded the refueling. We conclude that the clear and specific language of the Bunker Confirmation, coupled with Kien Hung's acceptance of the fuel bunkers without protest after receiving the Bunker Confirmation, reflect that the contract incorporated the Terms and Conditions as a matter of Malaysian law.

[4] The only relevant Malaysian case makes crystal-clear that Malaysian courts accord dispositive weight to the "words and actings" of the parties in deciding whether they intended to incorporate a clause. *Bauer Sdn Bhd v. Daewoo Corp.*, (Malaysian Court of Appeal 1999) 4 MLJ 545, 560. In *Bauer*, the Malaysian court held that an arbitration clause from a previous work order was not incorporated into later work orders in part because there was an absence of "the language that is

---

[7]*See* TETLEY at 1331 (stating that Malaysian maritime law is primarily English maritime law).

necessary to reasonably support the finding of an intention to incorporate." *Id.*

**[5]** In addition, under Malaysian law, "a term may be incorporated not only by words but also by conduct." *Id.* at 559. The court in *Bauer* found instructive an English case involving the incorporation of disputed terms. *Id.* (citing *British Crane Hire v. Ipswich Plant Hire Ltd.*, [1975] Q.B. 303 (Eng.)). Even though one party had not expressed assent to the terms, "the common understanding which is to be derived from the conduct of the parties," *i.e.*, the acceptance of goods without protesting the subsequently mailed conditions, indicated that those terms were incorporated into the contract. *British Crane*, [1975] Q.B. at 311.

**[6]** Here, both the contract language and the parties' conduct support the conclusion that Trans-Tec's Terms and Conditions were incorporated into the bunker contract. The documents at issue are the Kien Hung order and the Bunker Confirmation. In response to Kien Hung's order, the Bunker Confirmation email unambiguously stated that "[t]his confirmation incorporates seller's standard terms and conditions dated 3 January 2000." That language "reasonably support[s] the finding of an intention to incorporate" the Terms and Conditions. *Bauer*, 4 MLJ at 560.

**[7]** Kien Hung's conduct also demonstrates that the parties intended to incorporate the Terms and Conditions. *See id.* Kien Hung neither objected to, nor requested a copy of, the Terms and Conditions after receiving the Bunker Confirmation, even though the Bunker Confirmation expressly stated, "Pls inform us if you require a copy" of the Terms and Conditions. A Kien Hung manager received the Bunker Confirmation one week before Kien Hung accepted delivery of Trans-Tec's fuel bunkers in Busan, giving Kien Hung sufficient time to request the Terms and Conditions, reject any or all of them, or change course entirely. The district court correctly concluded that under Malaysian law, the parties' language and

conduct demonstrated that the Terms and Conditions, including the United States choice of law provision, were incorporated as a term of the bunker contract.

## III.   GIVING EFFECT TO THE UNITED STATES CHOICE OF LAW PROVISION

Having determined that the United States choice of law provision was a term of the contract, we address Splendid's argument that we should not give effect to that provision because the transaction is "too foreign" to apply United States law. To take Splendid's approach would steer us off course because it ignores both the long-recognized principle of honoring the expectations of the parties to a contract and the scope of a maritime lien under the FMLA.

## A.   RECOGNITION OF THE CHOICE OF LAW PROVISION

[8] Absent a strong showing that it should be set aside, the parties' choice of law provision, as part of a "freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power . . . should be given full effect." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972). This presumption in favor of enforcing contract provisions encourages predictability in the law, particularly in the international arena. *See* RESTATEMENT § 187(2) cmt. e (stating that predictability is best served "by letting the parties choose the law to govern the validity of the contract and the rights created thereby").

That this transaction involved multiple foreign points of contact does not dissuade us from recognizing the parties' agreed-upon law and jurisdiction. In *Liverpool & London S.S. Protection & Indemnity Association v. Queen of Leman MV*, 296 F.3d 350 (5th Cir. 2002), the Fifth Circuit upheld a maritime lien asserted by an English insurer against a vessel whose insurance premiums had gone unpaid. Even though the insurance contract was governed by English law, the court

honored a provision in the contract that the insurer could "enforce its right of lien in any jurisdiction in accordance with local law in such jurisdiction." *Id.* at 353. By bringing suit in the Eastern District of Louisiana, the insurer was entitled to seek a maritime lien under the FMLA, as United States law was the "local law." The Fifth Circuit declared that "there is nothing absurd about applying the law of the jurisdiction into which the ship sails, as the ship's presence in the jurisdiction represents a substantial contact." *Id.* at 354.

**[9]** *Queen of Leman* thus counsels that where foreign parties have specified that they want United States law to determine the existence of a maritime lien in a transaction involving multiple foreign points of contact, and the ship has sailed into the United States, it is reasonable to uphold the choice of American law. That a maritime lien might exist on the vessel under United States law, but would not exist under Malaysian law, was a consequence obviously contemplated by the contracting parties, and because the *Harmony* sailed into a United States port, results in no fundamental unfairness.[8]

We agree with the Fifth Circuit's holding in *Queen of Leman*, but recognize that it is in tension with the Second Circuit's view in *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024 (2d Cir. 1973). There, the court refused to apply a United States choice of law clause to decide whether a charterer was entitled to a maritime lien because application of United States law would have adversely affected the rights of a third-party creditor. *Id.* at 1026. Rather than apply the charter's choice of law clause, the Second Circuit conducted a *Lauritzen* analysis to determine which country's law governed

---

[8]Our holding in *Tento* supports this conclusion. 694 F.2d 1191. There, in the absence of an express choice of law, we conducted a *Lauritzen* analysis and held that United States law properly applied, notwithstanding the "foreignness" of the transaction: the vessel and its owner were Norwegian, the fuel supplier was Italian, and the fuel was provided in an Italian port. *Id.* at 1196.

the existence of a maritime lien. *Id.* at 1026-27. It is worth noting that the adversely affected party involved in *Rainbow Line* was a third-party lender to a subsequent owner of the vessel, an entity far removed from the original parties to the charter. For the reasons previously stated, we prefer the Fifth Circuit's rule in *Queen of Leman*.

A Canadian court that recently faced a similar choice of law provision and an array of foreign players applied the parties' choice of United States law and recognized the existence of a maritime lien under the FMLA. *Kirgan Holding S.A. v. Ship Panamax Leader*, [2002] F.C. 1235 (Can.), *reprinted in* 2002 A.M.C. 2917. Although Canadian law has no precedential value here, the decision is instructive, particularly in light of the relatively uncharted waters presented by this appeal. The court upheld the parties' chosen law, even though, as Splendid would put it, all the points of contact involved were "foreign": the supplier was Panamanian, the vessel was registered under the flags of Malta and Cyprus, the vessel owner was Maltese, the charterer was Caribbean, and the provision of fuel bunkers occurred in Malta. The only contact that the transaction had with Canada, whose law does not provide for a maritime lien for the supply of necessaries, was that the vessel was arrested in a Quebec port. The Canadian court concluded that the provision should be respected. *Id.* We agree with that conclusion and now turn our focus to the FMLA.

**B.    APPLICATION OF THE FMLA**

According to United States maritime lien law, "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel" and "may bring a civil action in rem to enforce the lien." 46 U.S.C. § 31342. Splendid's siren song about the presumption against extraterritorial application of United States law fails to distract us from reaching the clear-cut conclusion that the FMLA's plain language demands: A maritime lien

arose in favor of Trans-Tec because it provided necessaries[9] to the *Harmony* on the order of the *Harmony*'s charterer. Charterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries. *Id.* § 31341; *see also* TETLEY at 602-03; THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 9-3 (4th ed. 2004) ("SCHOENBAUM"). As our decision rests in part on the unique nature of the remedy sought in this case, we offer a brief primer on maritime liens.

## 1.   BACKGROUND ON MARITIME LIENS IN THE UNITED STATES

[10] A maritime lien is "one of the most striking peculiarities of Admiralty law, constituting a charge upon ships of a nature unknown alike to common law and equity." *Black's Law Dictionary* 943 (8th ed. 2004) (quoting GRIFFITH PRICE, THE LAW OF MARITIME LIENS 1 (1940)). It has been defined as: "(1) a privileged claim, (2) upon maritime property, (3) for service done to it or injury caused by it, (4) accruing from the moment when the claim attaches, (5) travelling with the property unconditionally, (6) enforced by means of an action in rem." *Id.* (quoting Price at 1). The lien gives the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds of the sale. *Equilease*, 793 F.2d at 602.

The maritime lien serves the "dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away." *Id.* In other words, a maritime lien may be considered "a right based upon the legal fiction that the *ship* is the wrongdoer—the ship itself caused the loss and can be called to the bar to make good the loss." SCHOENBAUM § 9-1 (emphasis added).

---

[9]Fuel bunkers are "necessaries" within the meaning of § 31342, as they were "useful" to the *Harmony* and "enable[d] her to perform her particular function." *See Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 603 (5th Cir. 1986) (en banc); *accord Bominflot, Inc. v. The M/V Henrich S*, 465 F.3d 144, 147 (4th Cir. 2006); *Hoegh Shield*, 658 F.2d at 367.

The United States, through common law and statute, has long recognized and enforced maritime liens. *Id.* As reflected in the earliest Supreme Court cases on maritime liens, this remedy was premised on concern for the vessel. Throughout the nineteenth century, the Court recognized that maritime liens could arise for the provision of necessaries in "foreign ports," or ports that were not the vessel's home port, in order to keep the vessel fit for sail. *See, e.g.*, *The St. Jago de Cuba*, 22 U.S. (9 Wheat.) 409, 416-18 (1824) (stating that the "consideration that controls every other" is that "[t]he vessel must get on"); *The Gen. Smith*, 17 U.S. (4 Wheat.) 438, 443 (1819). Conferring a lien on the vessel to "material-men" ensured the continued maintenance of vessels by encouraging suppliers to provide necessaries in foreign ports. *See The J.E. Rumbell*, 148 U.S. 1, 9 (1893) (observing that maritime liens for necessaries furnished "to keep a vessel fit for sea" took precedence over all other claims except seamen's wages or salvage).

Before 1910, when the FMLA was first enacted, an odd distinction existed in the American law of maritime liens: a maritime lien arose for the provision of necessaries in a port in a foreign country or foreign state, but no lien arose if necessaries were supplied in the vessel's home port. *The Roanoke*, 189 U.S. 185, 193-94 (1903); *The Gen. Smith*, 17 U.S. at 443. As a consequence of this anomaly, a lien on a vessel for the provision of supplies in a port of the vessel's home state could arise only if there were state legislation to that effect. *The Gen. Smith*, 17 U.S. at 443. The significant variance among the state statutes was of concern to the Supreme Court. Lucian Y. Ray, *Maritime Contract Liens*, 47 Tul. L. Rev. 587, 589 (1973). In 1874, Justice Bradley, writing for the Court, hinted that Congress "might adopt a uniform rule for the whole country" to govern maritime liens. *The Lottawanna*, 88 U.S. (21 Wall.) 558, 577 (1874) (Bradley, J.).

Congress responded in 1910 by passing the FMLA. Act of June 23, 1910, ch. 373, § 1, 36 Stat. 604. The legislative purpose was three-fold: (1) to overrule the home port doctrine;

(2) to nullify the doctrine that, when a vessel's owner contracted in person for necessaries or was present in the port when they were ordered, it was presumed that the supplier did not intend to rely upon the vessel's credit, such that a lien did not arise; and (3) to substitute a single federal maritime statute for the varying state statutes dealing with necessaries. *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 11 (1920); *see also Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 271-72 (1940) (stating that the FMLA's purpose was to "simplify and clarify the rules as to maritime liens as to which there had been much confusion"). In addition, the FMLA, by favoring suppliers regardless of where necessaries were provided, was intended to boost a faltering merchant marine industry. *Equilease*, 793 F.2d at 602. In effect, the FMLA "was intended to operate in aid of those who supply necessaries to ships and it correspondingly restricted the rights of the owners of the vessels." *Dampskibsselskabet*, 310 U.S. at 273.

In 1920, Congress codified the FMLA as part of the Ship Mortgage Act of 1920, 46 U.S.C. §§ 971-75, but the substance of the lien law was left virtually unchanged until 1971. TETLEY at 604. Under the original legislation, a vessel owner's insertion of a "no lien" clause in the charter-party prohibited suppliers from obtaining a lien if a provider "knew, or by exercise of reasonable diligence could have ascertained" that no lien would be available. *Id.* (emphasis omitted). Under the 1971 amendments, the "reasonable diligence" standard was dropped in favor of an "actual knowledge" standard. The legislation thus voids a "no lien" clause, as long as the supplier did not have knowledge of the clause. H.R. REP. NO. 92-340 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1363. Therefore, even though the charter-party between Splendid and Kien Hung forbade Kien Hung from incurring liens on the *Harmony*, that fact, standing alone, does not prevent Trans-Tec from obtaining a maritime lien in this case, as nothing in the record indicates that Trans-Tec knew of the provision.

In 1988, Congress repealed all previous maritime lien statutes and recodified the prior law on maritime liens as part of the Commercial Instruments and Maritime Liens Act. Pub. L. No. 100-710 (1988), 102 Stat. 4735 (codified at 46 U.S.C. § 31301 *et seq.*). Congressional reports indicated that the new law was not intended to make any substantive changes to the FMLA, and the lien provisions are still generally referred to as "the FMLA." H.R. REP. NO. 100-918 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6104, 6107, 6141; TETLEY at 587-88.

## 2. APPLICATION OF THE FMLA

**[11]** The language of the FMLA is clear and unambiguous:

[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

  (1)   has a maritime lien on the vessel;

  (2)   may bring a civil action in rem to enforce the lien; and

  (3)   is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342. The statute imposes no restriction on the nationality or other identity of the supplier or the vessel, and no geographic restriction on the place of provision of the necessaries. Splendid endeavors to shoehorn the FMLA into a narrower statute than it is by arguing that the FMLA does not give a maritime lien to a foreign necessaries provider for the provision of supplies to a foreign vessel in a foreign port. However, we are not persuaded by Splendid's constrained and unsupported view of United States maritime lien law.

**[12]** In accord with Supreme Court teachings, *see, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 8 (2004), we begin our analy-

sis with the language of the statute. "[A] person providing necessaries" means any person, not only an "American person." The FMLA, by its plain language, is not restricted in application to United States citizens, American companies, or companies doing business in the United States. Though Congress may have had American suppliers in mind, the statute, on its face, recognizes a maritime lien in favor of *any* person providing necessaries.

Although we need not look beyond the plain language of the statute, we address Splendid's argument that the House Report's mention of "American materialmen" is reason to deny Trans-Tec a maritime lien. *See* H. REP. NO. 92-340 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1363 (stating that enactment would "be of great assistance to American materialmen in collecting amounts owed on necessaries"). Splendid fails to point out that the Report did not exclude foreign "materialmen" from its reach, and the Committee's reasons for protecting American suppliers extend to foreign suppliers, as well:

> Granting the materialman a lien encourages the prompt furnishing of necessaries to vessels so that they can be speedily turned around and put to sea. This is especially significant today when the emphasis on vessel performance is reduced port time and increased speed.

*Id.* Given Congress's expressed hope that the amended Act would "encourage[ ] the prompt furnishing of necessaries to vessels so that they can be turned around and put to sea," *id.*, it would undo Congress's aim to recognize maritime liens only in favor of American materialmen. In any event, this passing reference hardly overrides the unambiguous language of the statute.

The statute also states that a maritime lien arises upon the provision of necessaries to "a vessel." Again, the statute's lan-

guage is not limited to American vessels. Though § 31342 mentions only "a vessel," the "inference to be drawn from the legislative history is that section 31342 will be interpreted similarly to former sect. 971," which stated that the lien applied to "any vessel, whether foreign or domestic." TETLEY at 597. An abundance of case law has recognized a maritime lien under the FMLA where necessaries have been provided to a foreign-flagged vessel. *See, e.g.*, *Hoegh Shield*, 658 F.2d at 368 (holding that maritime lien arose on Norwegian vessel); *Loginter S.A. v. M/V Nobility*, 177 F. Supp. 2d 411, 415 (D. Md. 2001) (Maltese vessel); *Mobil Sales & Supply Corp. v. The Vessel Panamax Venus*, 1986 A.M.C 420, 423 (C.D. Cal. 1985) (Liberian vessel).

Finally, the statute does not discriminate between the provision of necessaries in the vessel's home port and a foreign port. As previously noted, Congress expressly jettisoned the "home port doctrine" with the passage of the FMLA in 1910, thus allowing maritime liens regardless of whether necessaries were provided in the vessel's home port or in a foreign port. *See* TETLEY at 597. Cases in the wake of the FMLA's passage have faithfully recognized maritime liens where necessaries have been provided in foreign ports. *See, e.g.*, *Ryan Walsh, Inc. v. M/V Ocean Trader*, 930 F. Supp. 210, 219 (D. Md. 1996) (oil provided to vessel in Indonesia); *Mobil Sales*, 1986 A.M.C. at 423 (oil provided to vessel in China and Japan). In sum, putting together the pieces of this statutory puzzle makes evident that because Trans-Tec provided necessaries to the *Harmony* on the order of its charterer, a maritime lien arose in favor of Trans-Tec.

Splendid posits that applying the FMLA to a foreign supplier providing necessaries in a foreign locale to a foreign flag vessel would somehow result in the "extraterritorial" application of United States maritime lien law. Splendid's argument obscures several important points, including the nature of admiralty law and the high seas, the parties' agreement to apply United States maritime lien law, and the fact that the

*Harmony* routinely sailed into a United States port and was subject to *in rem* jurisdiction in California when the *Harmony*'s insurers posted a bond to avoid its seizure.

Nothing in the statute supports Splendid's argument that the FMLA does not apply to situations involving a foreign vessel, a foreign supplier, and provision in a foreign port. Other courts facing similar scenarios have given the FMLA the fair reading that its plain language demands, and have found no reason to narrow it. *See, e.g.*, *Queen of Leman*, 296 F.3d at 352-53 (stating that if United States law applied, the FMLA would create a maritime lien for the insurance provided); *Kirgan Holding*, [2002] F.C. 1235 (holding that a maritime lien arose under the FMLA for the provision of fuel bunkers to a foreign-flagged vessel in Malta).

Hardly any area of law could be viewed as more extraterritorial than admiralty law. It is well settled that the admiralty jurisdiction of United States courts extends to the high seas: "The traditional domain of admiralty jurisdiction is, of course, the sea . . . ." SCHOENBAUM § 3-3. Save for inland navigable waters, ports, and a few other locations, admiralty jurisdiction by definition extends beyond United States territorial boundaries. Tethering United States maritime lien law to situations involving only American-flagged vessels, American suppliers, or American ports would threaten the ability of foreign vessels to move freely from port to port without the fear of going without necessaries. *See The St. Jago de Cuba*, 22 U.S. at 416 (stating that "the consideration that controls every other" is that "[t]he vessel must get on").

Splendid argues that extension of the FMLA to "completely foreign transactions" seriously interferes with other nations' regulation of their commercial affairs because United States law allows for maritime liens for the provision of necessaries, and most other nations do not. But recognizing a maritime lien on the *Harmony* does not interfere with Malaysian law, which we applied at the outset to incorporate the United

States choice of law provision, or the law of any other nation implicated in this transaction. This case presents no extraterritorial "problem" of the ilk that has troubled the Supreme Court because here the parties chose United States law to control their transaction, and the vessel sailed to a United States port. *Cf. F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) (holding that foreign vitamin distributors could not bring a claim under the Foreign Trade Antitrust Improvements Act for solely foreign injury). Our conclusion does not curb the sovereignty of any other nation, or another country's ability to regulate its maritime affairs. In fact, recognition of freely negotiated contract terms encourages predictability and certainty in the realm of international maritime transactions.[10]

Splendid also has forgotten the crucial fact that this transaction was not "completely foreign." The subject of this *in rem* action is the vessel *Harmony*. Between October 2002 and March 2003, the *Harmony* transported $48.9 million in goods to and from Long Beach, California. That the *Harmony* was docked at Long Beach at the time that Trans-Tec filed suit was not mere happenstance: Long Beach was a regular stop on the *Harmony*'s route. These contacts with the United States, along with the parties' express agreement to apply United States maritime lien law, put to rest any fears that an American court is unilaterally imposing the FMLA on other nations.

---

[10]Given that approximately thirty nations recognize a maritime lien for the provision of necessaries, other countries have options, if desired, to address this circumstance. For example, a country could simply prohibit contracting parties from choosing United States or foreign maritime lien law in their contracts. Alternatively, national law could require charterers to inform suppliers of existing no-lien clauses in the charter-party. And, in the private arena, ship owners could take steps to give suppliers notice of the no-lien provisions, thus effecting actual notice of the provisions and preventing charterers from burdening the ship with maritime liens. *See* 46 U.S.C. § 31341 (stating that charterers are only *presumed* to have authority to bind the vessel).

Our reliance on the plain language of the statute is all the more justified when one considers that the tangled web of American case law[11] that bears on this issue is not particularly helpful in sorting out the answer. *Compare Conti Lines S.A. v. MV Baroness V*, 1992 A.M.C. 681, 683 (M.D. Fla. 1991) (holding that the "plain language of the statute and the history of the Federal Maritime Lien Act" allow foreign necessaries providers to obtain maritime liens) *with Swedish Telecom Radio v. M/V Discovery I*, 712 F. Supp. 1542, 1548 (S.D. Fla. 1989) (stating that the FMLA "was not intended to provide maritime liens for goods and services where . . . they are supplied by foreign companies in foreign ports") (citations omitted).

Both the district court and Splendid rely on an Eleventh Circuit case, *Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla*, 966 F.2d 613 (11th Cir. 1992), as the foundation for their conclusion that the FMLA does not apply to this transaction.[12] The most telling aspect of *Trinidad* is that the court acknowledged that the FMLA was not even in play: "§ 31342 is not even applicable to this case because, as we

---

[11]We appreciate the straightforward approach of the Canadian federal court that evaluated a strikingly similar situation in *Kirgan Holding*, [2002] F.C. 1235, *reprinted in* 2006 A.M.C. 812. After first deciding to enforce the parties' United States choice of law clause, the court determined that under the FMLA, a maritime lien arose in favor of the necessaries provider, without discussing any "extraterritorial" implications of doing so. *Id.* Despite Splendid's assertion that the case was overruled by *J.P. Morgan Chase Bank v. Mystras Maritime Corp.*, [2006] F.C. 409, *Kirgan* was merely distinguished on its facts. Though the outcomes of the two cases are difficult if not impossible to reconcile, we are persuaded by *Kirgan*.

[12]The district court also cited to BENEDICT ON ADMIRALTY, which states that there is no maritime lien under the FMLA for a supplier of goods and services to a foreign flag vessel in a foreign port. 2 BENEDICT ON ADMIRALTY § 38, at 3-35 (7th ed. 1997). *See also* SCHOENBAUM § 9-8. Neither treatise addresses the circumstances of a contractual choice of FMLA as controlling law and neither offers any substantive analysis, instead basing its reasoning on *Trinidad*.

have already held, English law governs." *Id.* at 617. In *Trinidad*, a Trinidadian corporation made repairs to a Norwegian vessel whose owners failed to pay. *Id.* at 614. Despite the contractual designation of English law, which does not recognize a maritime lien for repairs, the supplier sought a maritime lien under the FMLA. The court stated that "§ 31342 does not provide for a maritime lien for goods and services supplied by a foreign plaintiff to foreign flag vessels in foreign ports." *Id.* at 617 (citing *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42, 46 (1st Cir. 1986); *Swedish Telecom*, 712 F. Supp. at 1545-46). Having already determined that United States law was not applicable, the court's commentary—without any analysis—on § 31342 could hardly be less persuasive. One can argue about what is or is not dictum,[13] but it seems to us that a clearer case than this one cannot be found. Not only did the court recognize that United States law did not apply, but it did not even analyze § 31342, the statute at issue here.

The two cases cited as authority in *Trinidad* do not bolster its stray commentary. The plaintiff in *Tramp* was an English fuel broker that hired an American supplier to provide oil to a vessel. 805 F.2d at 44. Tramp paid the supplier, but Tramp was never paid, so it sought a maritime lien against the vessel. The First Circuit stated that under the FMLA, a supplier would be entitled to a maritime lien for providing fuel to the vessel. *Id.* However, because it was the intermediary that was unpaid, and not the fuel supplier, the FMLA did not apply to give the broker the "suppliers' rights to the lien": "We therefore think it unnecessary to protect American suppliers, and unfair to the vessel, to extend the availability of a maritime

---

[13]*See, e.g.*, *United States v. Johnson*, 256 F.3d 895, 914-16 (9th Cir. 2001) (en banc) (Kozinski, J., concurring); *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir. 1988) (Posner, J.) (defining dictum as "not a fully measured judicial pronouncement . . . not likely to be relied on by readers, and . . . may not have been part of the decision that resolved the case or controversy on which the court's jurisdiction depended (if a federal court)").

lien directly to an intermediate broker unknown to the vessel." *Id.* at 44, 46. The location and nationality of the supplier were not at issue. Instead, the lack of a relationship between the vessel and the intermediate broker meant that the broker could not obtain a maritime lien for merely arranging the provision of fuel to the vessel. *Id.* at 46 (noting that extending the suppliers' lien to intermediate brokers "could radically change the presuppositions of maritime commerce"). *Tramp* thus sheds no light here.

**[13]** Similarly, the Eleventh Circuit misread *Swedish Telecom*, the other case cited in *Trinidad*. As in *Trinidad*, the court ultimately decided that Swedish law—not United States law—governed the transaction. Nonetheless, as in *Trinidad*, the court offered the totally irrelevant view that "a foreign supplier of goods is precluded from acquiring a lien under the federal Act even if it supplies goods or services in an American port." *Swedish Telecom*, 712 F. Supp. at 1546. We are left with the firm conclusion that *Trinidad* is a house of cards that quickly tumbles with even the gentlest examination. Here, where the contract specified that "the laws of the United States" were to determine the existence of a maritime lien, our reliance on the plain language of the United States statute, rather than a case applying English law, comports with predictable judicial reasoning.

## IV. DISCOVERY DISPUTE

**[14]** The district court did not abuse its discretion by refusing Trans-Tec's request under Rule 56(f) for more time to take discovery. Trans-Tec has not shown that it diligently pursued its previous discovery opportunities, nor that further discovery is likely to produce evidence that would preclude summary judgment. *See Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994).

## CONCLUSION

We agree with the district court's conclusions that Malaysian law governs the issue of contract formation, and that

under Malaysian law, the United States choice of law provision was incorporated as a term of the bunker sale contract. We reverse the district court's holding that no maritime lien arose under the FMLA, and remand for proceedings in accordance with our decision.

**REVERSED in part, AFFIRMED in part, and REMANDED. Each party shall bear its own costs on appeal.**