# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
April 1, 2016

Lyle W. Cayce
Clerk

No. 15-30239

WORLD FUEL SERVICES SINGAPORE PTE, LIMITED,

Plaintiff - Appellee

v.

BULK JULIANA M/V, her engines, tackle, apparel, etc., in rem,

Defendant

BULK JULIANA, LIMITED,

Claimant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES and JOLLY, Circuit Judges, and MILLS, District Judge.[*]
EDITH H. JONES, Circuit Judge:

"This admiralty and maritime case concerns a Singapore-based marine fuel supplier's attempt to recover a debt arising from the supply of fuel oil bunkers in Singapore to a Panamanian-flag vessel, the M/V BULK JULIANA, which is beneficially owned by a United States company, operated and

---

[*] District Judge of the Northern District of Mississippi, sitting by designation.

No. 15-30239

managed by a United States company, and which was chartered by a German company." *World Fuel Servs. Singapore Pte, Ltd. v. Bulk Juliana M/V*, No. 13-5421, 2015 WL 575201, at *1 (E.D. La. Feb. 11, 2015). On summary judgment, the district court applied Singapore law to the formation of the fuel sales contract, enforced the parties' choice of law as the "General Maritime law of the United States," and concluded that the vessel lien under the Federal Maritime Lien Act ("FMLA"), 42 U.S.C. §§ 31341 and 31342, was enforceable. Agreeing with the district court's conclusion and substantially with its reasoning, we **AFFIRM AND REMAND**.

## BACKGROUND

World Fuel Services Corp., a Florida corporation, is the parent corporation of the World Fuel Services group of companies. This group of companies, which includes Plaintiff-Appellee WFS Singapore ("WFS Singapore") and WFS Europe, provides fuel to ocean-faring vessels around the world. Bulk Juliana Ltd. is the owner of the vessel M/V BULK JULIANA. On November 7, 2012, Peter Turner ("Turner"), Manager of Commercial Sales at WFS Europe, negotiated on behalf of WFS Singapore with Denmar for the delivery of the bunkers (fuel) to the vessel, which Denmar had recently time-chartered. On November 7, Turner, on behalf of WFS Singapore, confirmed the bunker order via email to Denmar.

The confirmation email outlined the terms of Denmar's bunker order. First, the email described the relative bargaining authorities of WFS Singapore and Denmar:

ALL SALES ARE ON THE CREDIT OF THE VSL [vessel]. BUYER IS PRESUMED TO HAVE AUTHORITY TO BIND THE VSL WITH A MARITIME LIEN. DISCLAIMER STAMPS PLACED BY VSL ON THE BUNKER RECEIPT WILL HAVE NO EFFECT AND DO NOT WAIVE THE SELLER'S LIEN.

2

No. 15-30239

Next, the email incorporated by reference the "General Terms and Conditions" (the "General Terms") of all such contracts entered into by WFS Singapore:

> THIS CONFIRMATION IS GOVERNED BY AND INCORPORATES BY REFERENCE SELLER'S GENERAL TERMS AND CONDITIONS IN EFFECT AS OF THE DATE THAT THIS CONFIRMATION IS ISSUED. THESE INCORPORATED AND REFERENCED TERMS CAN BE FOUND AT WWW.WFSCORP.COM. ALTERNATIVELY, YOU MAY INFORM US IF YOU REQUIRE A COPY AND SAME WILL BE PROVIDED TO YOU.

The "General Terms and Conditions" include three sections relevant to this appeal:

> 1. INCORPORATION AND MERGER:  Each sale of Products shall be confirmed by email, fax or other writing from the Seller to the Buyer ("Confirmation").  The Confirmation shall incorporate the General Terms by reference so that the General Terms thereby supplement and are made part of the particular terms set forth in the Confirmation.  The Confirmation and the General Terms shall together constitute the complete and exclusive agreement governing the transaction in question (the "Transaction"). . . .
>
> 8. CREDIT AND SECURITY:
>
> (a)  Products supplied in each Transaction are sold and effected on the credit of the Receiving Vessel, as well as on the promise of the Buyer to pay, and it is agreed and the Buyer warrants that the Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered . . . .
>
> (d) All sales made under these terms and conditions are made to the registered owner of the vessel, in addition to any other parties that may be listed as Buyer in the confirmation.  Any bunkers ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner and the registered owner is liable as a principal for payment of the bunker invoice. . . .
>
> 17. LAW AND JURISDICTION: The General Terms and each Transaction shall be governed by the General Maritime Law of the United States . . . The General Maritime Law of the United States

3

shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Any disputes concerning quality or quantity shall only be resolved in a court of competent jurisdiction in Florida. Disputes over payment and collection may be resolved, at Seller's option, in the Florida courts or in the courts of any jurisdiction where either the Receiving Vessel or an asset of the Buyer may be found. Each of the parties hereby irrevocably submits to the jurisdiction of any such court, and irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum or its foreign equivalent to the maintenance of any action in any such court. Seller shall be entitled to assert its right of lien or attachment or other rights, whether in law, in equity or otherwise, in any country where it finds the vessel. **BUYER AND SELLER WAIVE ANY RIGHT EITHER OF THEM MIGHT HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING FROM OR RELATED TO THE GENERAL TERMS OR ANY TRANSACTION.**

There is no indication in the record that Denmar ever objected to, or inquired about, the contractual terms expressed in the bunker confirmation email.

On November 13, Transocean Oil, a Singapore fuel supplier subcontracted by WFS Singapore, delivered the bunkers to the vessel at the Port of Singapore. R. L. Vicente, Master/Chief Engineer of the vessel, signed the Bunker Delivery Notes and affixed the vessel's stamp to each confirming receipt of the bunkers. On November 15, 2012, WFS Singapore issued an invoice to "MV BULK JULIANA AND/OR HER OWNERS/OPERATORS AND DENMAR . . . ." for the sale.

Because payment was never remitted, WFS Singapore filed a complaint in the Eastern District of Louisiana in August 2013, which sought the arrest of the vessel then docked in the Port of New Orleans and recovery of the sales price. (The complaint also named Denmar as a defendant, but Denmar had become insolvent and was dismissed.) The next day, an arrest warrant was issued by the district court. On September 13, 2013, Bulk Juliana claimed

ownership of the vessel, posted security to release it, and answered WFS Singapore's complaint. In its answer, Bulk Juliana asserted that: (1) WFS Singapore had no maritime lien under the law of Singapore (where the bunkers were delivered to the vessel); (2) WFS Singapore had no legal basis to assert a maritime lien under 46 U.S.C. § 31342 against the vessel; and (3) the WFS Singapore's arrest of the vessel was wrongful and improper and should be vacated by the district court.

Faced with conflicting motions on the validity and enforceability of the maritime lien, the district court ordered each party to file additional briefing concerning the choice-of-law issue before the court.

WFS Singapore argued that the maritime lien was valid because the contract contained a General Maritime Law of the United States choice-of-law provision that allowed Denmar to bind the vessel through the purchase of necessaries (the bunkers). Alternatively, WFS Singapore argued that even if Singapore law governed the formation of the contract, the parties' United States choice-of-law provision would still be valid, and therefore, the maritime lien would be enforceable. In support, WFS Singapore relied on the uncontroverted affidavit and testimony of Mr. Tan Chaun Bing Kendall ("Mr. Tan"), a Singapore law expert with bunker transaction experience. Mr. Tan opined that the contract's General Terms were valid under Singapore law, that the terms were validly incorporated into the sales agreement, and that the General Maritime Law of the United States choice-of-law provision was enforceable.

Conversely, Bulk Juliana contended that Singapore law controlled the dispute but did not afford WFS Singapore a maritime lien. Further, Bulk Juliana asserted that even if U.S. law controlled, the General Maritime Law of the United States choice-of-law provision in WFS Singapore's General Terms

only invoked U.S. maritime common law.  U.S. general maritime common law, however, is a term of art that, according to Bulk Juliana, is distinct from and does not encompass the federal maritime lien statute.  *See* 46 U.S.C. §31342(a).

The district court held that while Singapore law governed formation of the contract, WFS Singapore's bunker confirmation email validly incorporated by reference the General Terms, which included the General Maritime Law of the United States choice-of-law provision.  Because the General Maritime Law of the United States choice-of-law provision was valid under Singapore law, U.S. law controlled the dispute.  Finally, the parties' choice of law provision included by its terms the FMLA, rendering the maritime lien enforceable against the vessel.

Bulk Juliana appeals the district court's denial of its motion for summary judgment and grant of WFS's cross-motion.  This court has jurisdiction of the district court's interlocutory ruling based on admiralty law. 28 U.S.C. §1292(a)(3).

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*, applying the same standards as the district court.  *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012).  Summary judgment is only appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "On a motion for summary judgment, [this Court] must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009).  Additionally, this Court reviews questions of law, "including choice of law and contract interpretation, *de novo*."  *Waterfowl Liab. Co. v. United States*, 473 F.3d 135, 141 (5th Cir. 2006).

No. 15-30239

## DISCUSSION

This appeal presents the following issues: (1) whether, under Singapore law, the contract's General Terms that include a choice of U.S. maritime law were validly incorporated into the agreement and enforceable; (2) whether Denmar, the charterer, had authority to bind the vessel *in rem* even though Bulk Juliana, the owner, was not a party to the contract between WFS Singapore and Denmar; (3) whether the maritime lien was solely created by a contractual term; and (4) whether the choice of law clause using the term "General Maritime Law of the United States" includes the statutory FMLA. We discuss each issue below.

**I.    Whether the contract's General Terms, which include a U.S. choice of law provision, are valid under Singaporean law and were validly incorporated into the agreement.**

In this court, the parties no longer dispute the applicability of Singapore law to the contract's formation; thus, we need not consider whether a preliminary choice of law, based on maritime law principles, must be made as to the contract's formation. *See Lauritzen v. Larsen,* 345 U.S. 571, 582, 73 S. Ct. 921 (1953). Their continued disagreement centers instead on whether the General Terms were validly incorporated into the contract. *See Trans-Tec Asia v. M/V HARMONY CONTAINER,* 518 F.3d 1120, 1124 (9th Cir.), *cert. denied,* 555 U.S. 1062 (2008)(hereafter, "*Trans-Tec*"). The only record evidence on this point consists of undisputed testimony from WFS Singapore's expert witness, Mr. Tan. Mr. Tan testified that "the key guiding principle is that a Singapore court will seek to discern the contractual intention of both parties, which is to be ascertained by reference" to the following factors:

1. Is the incorporating language used sufficiently clear?

2. Does the document to be incorporated expressly state that its contents are to be applicable to the other party sought to be bound?

7

No. 15-30239

3. Is the document to be incorporated a common source of terms that are implied into such agreements of the same genre as the contract?

4. Did the party sought to be bound by the incorporated terms have access to, and/or was he in fact aware of the document at all material times?

5. Did the party sought to be bound by the incorporated document challenge or object to the applicability of the terms of that document to the contract?

Applying these factors, Mr. Tan opined that due to the "easy availability" of WFS Singapore's General Terms on the internet, as well as the "customary" nature of including such terms in "bunker supply contracts," the General Terms were validly incorporated into the contract, and are enforceable under Singapore law. Mr. Tan also concluded that "[u]nder Singapore law, a contractual provision for governing law where stipulated by parties in their agreement will generally be upheld as valid and enforceable."[1] *See also Trans-Tec*, 518 F.3d at 1126-27 ("That a maritime lien might exist on the vessel under United States law, but would not exist under Malaysian law, was a consequence obviously contemplated by the contracting parties, and . . . results in no fundamental unfairness.").

Bulk Juliana contends that the district court erred in accepting Mr. Tan's conclusions. Under Bulk Juliana's interpretation of the contract, neither the General Terms nor the U.S. choice-of-law provision was incorporated into

---

[1] Mr. Tan also cited *Halsbury's Laws of Singapore*, para. 75.344, which states:

Where an express choice has been made of the law of a country, even if the transaction has no connection with the country whose law is chosen, the choice will be given effect unless the choice was illegal or not made bona fide, or if the application of the foreign law will be contrary to the fundamental public policy of the forum.

the contract. Specifically, Bulk Juliana argues that that the fourth factor recited by Mr. Tan—"Did the party sought to be bound by the incorporated terms [the vessel] have access to, and/or was he in fact aware of the document at all material times?"—weighs clearly against WFS Singapore because the bunker delivery notes received by the vessel made absolutely no mention of WFS Singapore, the General Terms, or U.S. law. Therefore, the district court misapplied Singapore law in holding that the U.S. choice of law clause was binding on Bulk Juliana and the vessel *in rem*. Absent this clause, Singapore law does not recognize maritime liens. *See Sembawang Shipyard, Ltd. v. Charger, Inc.*, 955 F.2d 983, 988 (5th Cir. 1992) (holding that, unlike U.S. law, maritime liens are not authorized by Singapore law).

Bulk Juliana has failed to controvert Mr. Tan's testimony. The record is clear that Mr. Tan considered and applied the fourth factor, as well as the other factors, before concluding that the contract was "sufficiently specific to its reference" to the General Terms. Moreover, Mr. Tan opined that in his experience, "it is customary for bunker supply contracts to be concluded on the basis of the supplier's standard terms and conditions that are incorporated by reference in the bunker confirmation." Even assuming *arguendo* that WFS Singapore failed to satisfy the fourth factor described by Mr. Tan, Bulk Juliana offered no authority for the proposition that the failure to establish one out of five factors is fatal to the incorporation of the General Terms under Singaporean law.

Although Mr. Tan's testimony did not address the bunker delivery notes, he affirmed the incorporation of the General Terms by reference to the bunker confirmation email, which provided all the relevant terms and conditions of the contract. We recognize that neither Bulk Juliana nor the vessel was a party to the bunker confirmation email, and therefore did not have access to and/or awareness of the specific document at all material times. Mr. Tan, however,

testified about the ready availability of the contractual terms via the internet, as well as the prevalence of the practices employed here with respect to sales of necessaries in the shipping industry. Importantly, Mr. Tan pointed out that WFS Singapore's incorporation of the General Terms was "commonplace in the bunkering industry worldwide, and ought to be in the contemplation of ship operators and ship-owners such as [Bulk Juliana]."

Accordingly, the district court did not err in holding that the General Terms, including the U.S. choice-of-law provision, were valid and enforceable under Singapore law and were validly incorporated into the contract.[2] The remainder of our analysis, contrary to Bulk Juliana's arguments, relies on United States law.

## II. Whether Denmar, the charterer, could bind the vessel through a maritime lien even though Bulk Juliana, the owner, was not a party to the contract between WFS Singapore and Denmar

The district court determined that Denmar had presumptive authority to bind the vessel by procuring necessaries even though Bulk Juliana was not a party to the contract with WFS Singapore. Therefore, the maritime lien *in rem* pursuant to the FMLA was valid. *See Triton Marine Fuels, Ltd v. M/V PACIFIC CHUKOTKA*, 575 F.3d 409, 414 (4th Cir. 2009) (quoting *Trans–Tec*, 518 F.3d at 1127-28 (9th Cir.2008)) ("It is a fundamental tenet of maritime law that '[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries.'"). This result flows from the application

---

[2] Bulk Juliana contends for the first time on appeal that this case presents a recognized exception to the enforcement of a choice-of-law-provision—when such a provision is used for the sole purpose of avoiding other applicable law. *See Peh Teck Quee v. Bayerische Landesbank Girozentrale* [1999] 3 SLR (R) 842, 848. On this basis, Bulk Juliana argues that the provision is unenforceable. Bulk Juliana has waived this argument by not raising it in the district court. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976).

of U.S. maritime law, as interpreted by this court and others.  Nevertheless, Bulk Juliana challenges the principle that the vessel, a "third party" stranger to the sale, could be bound by the Denmar-WFS Singapore contract for bunkers.

Like the district court, we must follow this court's decision in *QUEEN OF LEMAN*, which unabashedly enforced, against a non-party to the contract, a maritime lien for vessel insurance, which was created under the auspices of a choice of law clause.  *Liverpool & London S.S. Protection & Indemnity Ass'n. v. QUEEN OF LEMAN M/V*, 296 F.3d 350, 354-55 (5th Cir. 2002).  Bulk Juliana attempts to distinguish this decision on the basis that the underlying maritime lien in *QUEEN OF LEMAN* was imposed by a contract with one owner of a vessel but enforced against the vessel after its acquisition by another owner.  From the standpoint of the third party's lack of knowledge and failure to acquiesce in the creation of the debt, however, we see no principled distinction from this case.  Nor have other circuits, which have cited *QUEEN OF LEMAN* with approval in the course of enforcing maritime necessaries liens authorized pursuant to enforcement of choice of law clauses calling for U.S. law.  *See Triton Marine Fuels*, 575 F.3d at 414-15; *Trans-Tec,* 518 F.3d at 1126-27.

In fact, each of those cases arises from facts quite similar to those before us.  *Triton* upheld a  U.S. maritime lien claimed against a vessel and its owner by a foreign company that supplied bunkers in a foreign port.  *Trans-Tec* validated a choice of U.S. law, and thus the FMLA lien, where the choice of law was adopted in a contract concerning the sale of fuel to a foreign-flagged vessel in a foreign port.  The *Trans-Tec* court quoted *QUEEN OF LEMAN*'s proposition that "there is nothing absurd about applying the law of the jurisdiction into which the ship sails, as the ship's presence in the jurisdiction represents a substantial contact."  *Trans-Tec,* 518 F.3d at 1126 (quoting

*QUEEN OF LEMAN*, 296 F.3d at 354.).  The court went on to explain, "*QUEEN OF LEMAN* thus counsels that where foreign parties have specified that they want United States law to determine the existence of a maritime lien in a transaction involving multiple foreign points of contact, and the ship has sailed into the United States, it is reasonable to uphold the choice of American law." *Id.*

It is hard to understand why, but Bulk Juliana acknowledged the holdings of *Triton* and *Trans-Tec* adverse to its position only in a footnote in its brief.  Instead, it relies heavily on the Second Circuit's decision in *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024 (2d Cir. 1973).  The Second Circuit alone is arguably contrary to *QUEEN OF LEMAN*.  Unlike Bulk Juliana, we do not believe the majority of circuit courts have erred legally or practically when they have found it appropriate to enforce maritime choice of U.S. law clauses, and the resultant FMLA liens, in these cases.  Owners of ocean-going vessels are by their nature internationally oriented, sophisticated, and fully able to protect themselves contractually in their dealings with time charterers from any perceived unfairness by the possible enforcement of maritime necessaries liens in U.S. ports.  Further, "recognition of freely negotiated contract terms encourages predictability and certainty in the realm of international maritime transactions." *Trans-Tec,* 518 F.3d at 1131.

As a matter of black-letter law under the FMLA, based on the parties' valid choice of U.S. law and the holdings of this circuit and others, Denmar as time charterer had authority to bind the vessel *in rem* for its purchase of bunkers, and the lien is enforceable in U.S. courts.

### III.    Whether the maritime lien was created by a contractual term, rather than by an operation of law

Bulk Juliana contends that the U.S. choice-of-law provision in the contract between Denmar and WFS Singapore was an improper attempt to

create a maritime lien by contract where none can arise except by operation of law. *Rainbow Line*, 480 F.2d at 1026. Citing *QUEEN OF LEMAN*, however, the district court determined that the maritime lien did not arise simply as a matter of contract, but as a matter of law under the FMLA. *World Fuel Servs. Singapore*, 2015 WL 575201, at *6. We agree. The maritime lien on the vessel was not created merely by the terms of the Denmar-WFS Singapore contract. As stated above, the U.S. choice-of-law provision in the contract includes the FMLA. Because the FMLA creates the authority for a charterer to bind the vessel through the procurement of necessaries, a valid maritime lien was created by operation of U.S. law.[3]

### IV. Whether the term "General Maritime Law of the United States" includes the maritime lien statute, 42 U.S.C. §§ 31341 and 31342.

Bulk Juliana asserts that the contract provision choosing the "General Maritime Law of the United States" incorporates not *all* U.S. maritime law but only judicially crafted maritime common law. *See McBride v. Estis Well Serv., L.L.C.*, 731 F.3d 505, 507-08 (5th Cir. 2013). Bulk Juliana essentially contends that the contract relies on "general maritime law," a term of art limited to maritime common law. As such, the term excludes statutory maritime liens, which exist only under the FMLA. Without the express inclusion of the FMLA in the General Terms, WFS Singapore's contract did not recognize Denmar's authority to bind the vessel for purposes of a U.S. maritime lien.

---

[3] Bulk Juliana's reliance on *Gulf Trading & Transp. Co. v. The Vessel Hoegh Shield*, 658 F.2d 363 (5th Cir. 1981), is misplaced. In *Hoegh Shield*, as the court noted in *QUEEN OF* LEMAN, the contract at issue did not have a choice-of-law provision governing the existence of a maritime lien. *Hoegh Shield*, 658 F.2d at 368. The same distinction pertains to *Arochem Corp. v. Wilomi, Inc.,* 962 F.2d 496 (4th Cir. 1992).

No. 15-30239

Paragraph seventeen of the General Terms provides:

The General Terms and each Transaction shall be governed by the General Maritime Law of the United States . . . [t]he General Maritime Law of the United States shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. . . . .

Once the validity and enforceability of the choice of law clause were upheld pursuant to Singapore law, the contract's interpretation is controlled by U.S. law.  The district court noted that a conclusion that the "General Maritime Law of the United States" term includes the FMLA is supported by the general principles of contract interpretation. *World Fuel Servs. Singapore*, 2015 WL 575201, at \*6.  The district court stated:

Clearly WFS chose for its bunker supply contracts the General Maritime Law of the United States because it wanted to secure payments in the form of maritime liens.  To read the language so narrowly as to conclude that it includes only maritime common law and not maritime statutory law divorces the language from the intended meaning behind it . . . .  Only where other tools of contract interpretation do not resolve the dispute does a court deem a term ambiguous and interpret it against its drafter.

*Id.*; *see also Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004) ("A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous.").

We agree with the district court.  Numerous references in the contract refer to maritime liens. The bunker confirmation email specified that the buyer is "presumed" to have authority to bind the vessel with a maritime lien.  The contractual language within WFS Singapore's U.S. choice-of-law provision amplifies that: "The General Maritime Law of the United States shall apply with respect to the existence of a maritime lien."  This language would make no sense if "General Maritime Law" were construed as a term of art that

14

distinguishes between U.S. maritime common law and the FMLA.  Paragraph 8(d) of the General Terms provides that: "Any bunkers ordered by an agent, management company, *charterer*, broker or any other party are ordered on behalf of the registered owner and the registered owner is liable as a principal for payment of the bunker invoice." (emphasis added).  Because the FMLA provides the exclusive method for a charterer (like Denmar) to bind a vessel through the procurement of necessaries—the maritime lien—without the knowledge of the vessel owner, it is a natural inference that the term "General Maritime Law of the United States" includes the FMLA.  Paragraph 8(a) also warrants that the seller will have and may enforce a maritime lien.  Bulk Juliana's effort to isolate and artificially constrict the meaning of the choice of law clause in this contract fails in the face of the contract's numerous references to maritime liens.

In addition to using the tools of contract interpretation, the district court relied on another district court decision, *World Fuel Servs. Trading*, 12 F. Supp. 3d at 792, that interpreted an identical U.S. choice-of-law provision.  Tracing the history of American maritime lien law in detail, the *World Fuel Servs. Trading* court concluded that the "General Maritime Law of the United States" necessarily included the FMLA because "the 1971 deletion of the duty-of-inquiry 'statutory text' from the Federal Maritime Lien Act clearly evidences Congress's intent to 'speak directly to [the] question,' of whether a supplier of necessaries has a duty to inquire as to the presence and terms of a charter party."  *Id.* at 807 (citations omitted).  Consequently, "because 'the general maritime law must comply with [Congress's] resolution' of this 'particular issue,'" the *World Fuel Servs. Trading* court held that "'the General Maritime Law of the United States,' includes the Federal Maritime

15

Lien Act."[4]  *Id.* (citations omitted).  The Fourth Circuit affirmed the district court on the more limited basis that Florida law, alternatively applicable to this contract under the General Terms, must apply federal statutes pursuant to the Constitution's Supremacy Clause.  Either way, our decision is consistent with the result in the Fourth Circuit's case.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the order of the district court enforcing the maritime lien and **REMAND** for further proceedings consistent herewith.

---

[4] On appeal, the Fourth Circuit "assum[ed], without deciding that . . . the FMLA is not part of the "General Maritime Law of the United States." *World Fuel Servs. Trading*, 783 F.3d at 521.  The Fourth Circuit then proceeded under Florida law—as authorized by the residual language of paragraph 17 of the General Terms—and held that the "Supreme Court has long stated that 'a fundamental principle in our system of complex national policy mandates that the Constitution, laws, and treaties of the United States are as much a part of the law of every state as its own local laws and Constitution.'" *Id.* (citations omitted). Therefore, a "choice-of-law provision directing us to the laws of Florida thus encompasses federal statutory law, including the FMLA." *Id.*