EWING WERLEIN, JR., UNITED STATES DISTRICT JUDGE
Pending is Plaintiff Trans-Tec International S.R.L. d/b/a Trans-Tec's Motion for Summary Judgment (Document No. 34). After carefully considering the motion, response, and applicable law, the Court concludes for the following reasons that the motion should be granted.
I. Background
Plaintiff Trans-Tec International S.R.L. d/b/a Trans-Tec ("Trans-Tec") sues in rem to enforce against the M/V VIRTUOUS STRIKER a maritime lien for the supply of necessaries under the Federal Maritime Lien Act, 46 U.S.C. § 31342(a) ("FMLA").[1]
Trans-Tec, a Costa Rican corporation, "is part of a network of affiliated and related companies that provide fuel to ocean-going vessels throughout the world, doing business under the trade name 'World Fuel Services.' "[2] World Fuel Services (Denmark) ApS ("WFS Denmark") is also part of this network, and both entities are wholly owned by World Fuel Services Corporation ("WFS"), a Florida corporation.[3] Claimant Chartley World, Inc. ("Chartley") is the registered owner of the Bahamian-flagged vessel, the M/V VIRTUOUS STRIKER (the "Vessel").
In October 2014, Lars Olsen, a customer broker for WFS Denmark acting on Trans-Tec's authorization, negotiated a sales contract with Copenship Bulkers A/S ("Copenship"), a Danish charter company, to supply fuel bunkers to the Vessel to be *341 delivered at the Port of Offshore Trinidad.[4] On October 5, Olsen sent an email to Copenship confirming the order of "450.00 MTONS" of 380CST/ISO 8217:2005:RMG380 MAX 3.5% S at a price of "USD 629.00 / MTONS DELIVERED" (the "Bunker Confirmation").[5] The Bunker Confirmation identifies "TRANS-TEC A DBA/DIVISION OF Trans-Tec International SRL" as the Seller and "MV VIRTUOUS STRIKER AND HER OWNERS/OPERATORS AND COPENSHIP BULKERS A/S" as the Buyer.[6] The Bunker Confirmation describes the relative bargaining authorities of Trans-Tec and Copenship, noting that:
ALL SALES ARE ON THE CREDIT OF THE VSL. BUYER IS PRESUMED TO HAVE AUTHORITY TO BIND THE VSL WITH A MARITIME LIEN. DISCLAIMER STAMPS PLACED BY VSL ON THE BUNKER RECEIPT WILL HAVE NO EFFECT AND DO NOT WAIVE THE SELLER'S LIEN.[7]
The Bunker Confirmation also incorporates by reference Trans-Tec's General Terms and Conditions (the "General Terms"):
THIS CONFIRMATION IS GOVERNED BY AND INCORPORATES BY REFERENCE SELLER'S GENERAL TERMS AND CONDITIONS IN EFFECT AS OF THE DATE THAT THIS CONFIRMATION IS ISSUED. THESE INCORPORATED AND REFERENCED TERMS CAN BE FOUND AT WWW.WFSCORP.COM. ALTERNATIVELY, YOU MAY INFORM US IF YOU REQUIRE A COPY AND SAME WILL BE PROVIDED TO YOU.[8]
The General Terms, which are accessible through two clicks on the WFS website,[9] include the following relevant sections:
1. INCORPORATION AND MERGER: Each sale of Products shall be confirmed by e-mail, fax or other writing from the Seller to the Buyer ("Confirmation"). The Confirmation shall incorporate the General Terms by reference so that the General Terms thereby supplement and are made part of the particular terms set forth in the Confirmation. The Confirmation and the General Terms shall together constitute the complete and exclusive agreement governing the transaction in question (the "Transaction")....
* * *
8. CREDIT AND SECURITY:
(a) Products supplied in each Transaction are sold and effected on the credit of the Receiving Vessel, as well as on the promise of the Buyer to pay, and it is agreed and the Buyer warrants that the Seller will have and may assert a maritime lien against the Receiving Vessel for the amount due for the Products delivered....
(d) All sales made under these terms and conditions are made to the registered owner of the vessel, in addition to any other parties that may be listed as Buyer in the confirmation. Any bunkers ordered by an agent, management company, charterer, broker or any other party are ordered on behalf of the registered owner and the registered owner is *342 liable as a principal for payment of the bunker invoice.
* * *
17. LAW AND JURISDICTION: The General Terms and each Transaction shall be governed by the General Maritime Law of the United States and, in the event that the General Maritime Law of the United States is silent on the disputed issue, the law of the State of Florida, without reference to any conflict of laws rules which may result in the application of the laws of another jurisdiction. The General Maritime Law of the United States shall apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Any disputes concerning quality or quantity shall only be resolved in a court of competent jurisdiction in Florida. Disputes over payment and collection may be resolved, at Seller's option, in the Florida courts or in the courts of any jurisdiction where either the Receiving Vessel or an asset of the Buyer may be found. Each of the parties hereby irrevocably submits to the jurisdiction of any such court, and irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum or its foreign equivalent to the maintenance of any action in any such court. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any country where it finds the vessel. BUYER AND SELLER WAIVE ANY RIGHT EITHER OF THEM MIGHT HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING FROM OR RELATED TO THE GENERAL TERMS OR ANY TRANSACTION .[10]
There is no evidence that Copenship objected to or inquired about the General Terms.[11]
On October 7, 2014, Aegean Bunkering (Trinidad) Ltd., an independent subcontractor for Trans-Tec, delivered 450.015 metric tons of the specified fuel to the Vessel at the Port of Offshore Trinidad.[12] The next day, Trans-Tec sent to "M/V VIRTUOUS STRIKER AND/OR HER OWNERS/OPERATORS AND COPENSHIP BULKERS A/S" an invoice for $283,059.44, which amount reflects the agreed price for the fuel bunkers.[13] The invoice has not been paid and Trans-Tec filed this suit seeking the arrest of the Vessel and recovery of the sales price.[14]
The Court issued an arrest warrant, and the Vessel was arrested by the U.S. Marshals on February 23, 2016.[15] Chartley, as registered owner of the Vessel, posted a security bond and the vessel was released on March 11, 2016.[16] Trans-Tec filed notice that it incurred custodial expenses in the amount of $14,710.33 from the seizure of the Vessel and now moves for summary judgment.[17]
II. Legal Standard
Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Once the *343 movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id."[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id."A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record ... or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Id. 56(c)(3).
In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." Anderson, 106 S.Ct. at 2513.
III. Analysis
The central dispute is whether under Danish law Clause 17 of the General Terms, "Law and Jurisdiction," was properly incorporated into the agreement between Trans-Tec and Copenship such that Trans-Tec has the right to enforce a maritime lien against the Vessel for the supply of the bunkers. The Fifth Circuit recently decided an almost identical case involving Singaporean law. See World Fuel Services Singapore Pte, Ltd. v. Bulk Juliana M/V, 822 F.3d 766, 767 (5th Cir. 2016), cert. denied sub nom. Bulk Juliana, Ltd. v. World Fuel Services (Singapore) PTE, Ltd., --- U.S. ----, 137 S.Ct. 2290, 198 L.Ed.2d 744 (2017).
In Bulk Juliana, World Fuel Services Singapore Pte, Ltd. ("WFS Singapore"), a Singaporean fuel supplier, sought to recover a debt for the supply of fuel oil bunkers that were delivered to a Panamanian-flagged vessel, the M/V BULK JULIANA, which was beneficially owned and operated by United States companies and chartered by a German company. 822 F.3d at 767. WFS Singapore-like Trans-Tec here-is a member of the WFS group of companies and conducted its sale of fuel bunkers in virtually the same way as Trans-Tec. Id. at 768. An employee for another WFS affiliate negotiated the sale with the charter company on WFS Singapore's behalf and confirmed the order via email. Id. The WFS Singapore confirmation email includes the same language describing the parties' relative bargaining authorities and incorporating by reference the same WFS General Terms included in the Bunker Confirmation in this case. Id. Also as in *344 this case, there was no evidence that the charterer objected to the General Terms. Id. at 769. After not receiving payment, WFS Singapore filed a complaint and sought arrest of the M/V BULK JULIANA. Id. Bulk Juliana, Ltd., the owner of the M/V BULK JULIANA appeared, posted security to release the vessel, and then argued against enforcement of the maritime lien. Id.
The Fifth Circuit's controlling decision in Bulk Juliana discusses two important issues that are also present in this case: (1) whether the General Terms, including the U.S. choice-of-law provision, were validly incorporated in the contract and were enforceable, and (2) whether the charterer could bind the vessel in rem even though the vessel's owner was not a party to the contract for purchase of the fuel. Id. at 770. As to the first issue, the parties did not dispute the application of Singaporean law to contract formation, and thus, the court focused on the uncontroverted testimony of WFS Singapore's Singaporean law expert, who concluded based on several factors that "the General Terms were validly incorporated into the contract, and are enforceable under Singaporean law." Id. at 771. Finding no error in the district court's holding that the General Terms, including the choice-of-law provision were valid and enforceable under Singaporean law, the Fifth Circuit applied United States law to the remainder of the dispute. Id. at 772. As to the second issue, the Fifth Circuit stated that "[a]s a matter of black-letter law under the FMLA, based on the parties' valid choice of U.S. law and the holdings of this circuit and others, [the] time charter had authority to bind the vessel in rem for its purchase of bunkers, and the lien is enforceable in U.S. courts." Id. at 773-74 (relying on Liverpool & London S.S. Protection & Indemnity Ass'n v. QUEEN OF LEMAN M/V, 296 F.3d 350, 354-55 (5th Cir. 2002) ; Triton Marine Fuels. Ltd. v. M/V PACIFIC CHUKOTKA, 575 F.3d 409, 414 (4th Cir. 2009) ; Trans-Tec Asia v. M/V HARMONY CONTAINER, 518 F.3d 1120, 1124 (9th Cir. 2008) ).
Trans-Tec argues and Chartley does not dispute that Danish law applies to contract formation and whether the General Terms were validly incorporated in the contract.[18] Trans-Tec's Danish law expert, Alex Laudrup ("Laudrup") testified that "[t]he general rule under Danish contract law is that between two professional parties it is possible to incorporate standard terms and conditions merely by a reference to them, with the effect, that such terms form part of the contract between the parties."[19] Laudrup identified three "preconditions" that must be present at the time of contracting in order to incorporate terms by reference, including: "(i) a reference to the terms is made by one party in a communication to the other party, (ii) no objection to the terms is raised by the other party and (iii) that the terms are available or accessible to that other party."[20] He opined that each of the preconditions was met based on the "very clear" reference to the General Terms in the Bunker Confirmation, the accessibility of the General Terms on the WFS website, and the lack of objection from Copenship.[21]
Laudrup acknowledged that "a Danish court may find the terms incorporated by reference to be invalid if they are found to be especially burdensome to the other party," but explained that there was no basis in this case to set aside Clause 17 of the *345 General Terms as unreasonably burdensome.[22] Laudrup explained that normally jurisdiction and choice of law clauses between commercial parties are only deemed "unreasonably burdensome if the clause is very atypical for the given industry or if the parties involved have no connection to the given jurisdiction and/or choice of law."[23] Because Trans-Tec is part of a group of companies based in the United States, Laudrup explained that Danish courts would not find the terms of Clause 17 atypical.[24] Thus, Laudrup concluded, "under Danish law the incorporation of Clause 17 of the General Terms and the choice of law and jurisdiction stipulation would be valid and binding."[25]
Chartley's Danish law expert, Jens V. Mathiasen ("Mathiasen"), largely agrees with Laudrup's explanation of Danish law, stating that "Trans-Tec's attempt to incorporate its General Terms in the Bunker Sale Contract between Trans-Tec and Copenship Bulkers A/S seems to be in accordance with the above-mentioned conditions."[26] Mathiasen also states that
[h]owever, it should be stressed and strongly emphasized that under Danish law the terms of the Bunker Sale Contract only apply to and bind the contracting parties, i.e. Trans-Tec and Copenship Bunkers A/S.
There is nothing in the available documentation to suggest that the owner of the Vessel (Chartley World Incorporated) is a party to the Bunker Sale Contract (e.g. by way of dealings by the master of the Vessel) or in any other way is bound by the provisions of the Bunker Sales Contract, including the General Terms.[27]
Mathiasen's latter opinions go beyond the issue of whether the contracting parties themselves validly incorporated into the contract Clause 17 with its choice-of-law provision and are therefore beyond the scope of the Court's inquiry into Denmark's law.
In a similar case involving questions of Swedish law, a claimant's expert attacked the plaintiff's expert's testimony on incorporation by reference by "focusing on the opinion that [the vessel's owner] had not entered an agreement with Plaintiff and on the nonexistence of maritime liens for bunkers under the law of Sweden." Topoil AB v. M/V ORUC REIS, Civ. No. 4:15-cv-460, Document No. 34 at 16, 2016 WL 11474777 (S.D. Tex. Aug. 25, 2016), report and recommendation adopted , 2016 WL 5373029 (S.D. Tex. Sept. 26, 2016) (Lake, J.). The court rejected this argument, explaining that
[p]ursuant to the Fifth Circuit's analysis [in Bulk Juliana ], these issues are beyond the scope of consultation of the law of Sweden. The Fifth Circuit was concerned with whether choice-of-law provisions are enforceable under the law of Sweden and whether the method of incorporation met its legal standards. On *346 those points, Hoglund's testimony does not raise a fact issue.
Id. Similarly, here, Mathiasen's testimony, which focuses on the separate issue of whether Chartley was a party to the contract or can be bound thereby, does not raise a fact issue as to whether the choice-of-law provision contained in Clause 17 of the General Terms was in fact incorporated into the contract. On the latter point, Mathiasen's opinion is forthright that "Danish law recognizes the contracting parties' freedom to contract and chief among that the parties' ability to formulate their agreement by incorporating provisions from other documents.... Furthermore, Danish law recognizes the right of the contracting parties to select the law that will govern their agreement."[28]
Because the uncontroverted summary judgment evidence is that under Danish law, the General Terms, including the United States choice of law provision, were validly incorporated into the contract, United States law controls the remaining issues. See Bulk Juliana, 822 F.3d at 772 (explaining that because "the General Terms, including the U.S. choice-of-law provision, were valid and enforceable under Singapore law and were validly incorporated into the contract[,] [t]he remainder of our analysis, contrary to Bulk Juliana's arguments, relies on United States law").
Under United States law, charterers are presumed to have authority to bind the Vessel by the ordering of necessaries. Triton Marine, 575 F.3d at 414 ("It is a fundamental tenet of maritime law that '[c]harterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries.' ") (quoting Trans-Tec, 518 F.3d at 1127-28 ). Trans-Tec's maritime lien in rem pursuant to the FMLA is valid and enforceable. See generally Bulk Juliana, 822 F.3d at 772-74; id. at 773 ("[W]e do not believe the majority of circuit courts have erred legally or practically when they have found it appropriate to enforce maritime choice of U.S. law clauses, and the resultant FMLA liens, in these cases.") Accordingly, Trans-Tec is entitled to summary judgment.
IV. Order
For the foregoing reason, it is
ORDERED that Plaintiff Trans-Tec International S.R.L. d/b/a Trans-Tec's Motion for Summary Judgment (Document No. 34) is GRANTED. The parties shall submit a proposed final judgment, agreed as to form, within twenty-one (21) days after the date of this Order. If the parties cannot agree on the form of judgment, each party will submit its own proposed judgment along with a brief explanation why its proposed judgment should be entered by the Court.
The Clerk will enter this Order, providing a correct copy to all counsel of record.

Document No. 1 (Plf.'s Verified Orig. Compl.).

Document No. 34, ex. A ¶ 6.

Id., ex. A ¶¶ 6, 8.

Id., ex. A ¶ 13.

Id., ex. A-1.

Id.

Id.

Id.

Id., ex. A ¶ 18.

Id., ex. A-2 ¶¶ 1, 8, 17.

See ids="6055645" index="44" url="https://cite.case.law/f3d/822/766/#p767">id., ex. A ¶ 24.

Id., ex. A-3.

Id., ex. A-4; ids="6055645" index="47" url="https://cite.case.law/f3d/822/766/#p767">id., ex. A ¶ 26.

Document Nos. 1, 2.

Document Nos. 3, 4, 9.

Document Nos. 12, 14.

Document Nos. 21, 37.

Document No. 37 at 4 of 8.

Document No. 34, ex. C ¶ 14.

Id., ex. C ¶ 15.

Id., ex. C ¶¶ 27-30.

Id., ex. C ¶¶ 15, 32.

Id., ex. C ¶ 26.

Id., ex. C ¶¶ 33-35.

Id., e x. C ¶ 36.

Document No. 37, ex. A ¶ 3.3; see also id., ex. A ¶¶ 3.2, 3.4.

Id., ex. A ¶¶ 3.5-4.1. Mathiasen also states opinions in a section of his paper entitled "Maritime lien under Danish law," the essence of which are that "there is no statutory maritime lien for bunkers under Danish law" although parties to a contract may create a contractual maritime lien. This is much the same as the facts in Bulk Juliana, where Singapore law provided no maritime lien for bunkers delivered to the vessel. See Bulk Juliana, 822 F.3d at 770.

Id., ex. A ¶ 3.4.