**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

In re:

AMKO FISHING CO, INC.,

Debtor.

H3O COMMUNICATIONS, LLC,

Appellant,

v.

ELIZABETH A. KANE, Chapter 7 Trustee,

Appellee.

BAP No. HI-17-1255-TaLLs

Bk. No. 1:15-bk-00489

**MEMORANDUM**[*]

Argued and Submitted on June 21, 2018
at Pasadena, CA

Filed – August 7, 2018

Appeal from the United States Bankruptcy Court
for the District of Hawaii

Honorable Robert J. Faris, Chief Bankruptcy Judge, Presiding

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Appearances:    Shawn Anthony Luiz argued for appellant; Elaine Chow of Klevansky Piper, LLP argued for appellee.

Before:  Taylor, Lafferty, and Lastreto,[**] Bankruptcy Judges.

## INTRODUCTION

AMKO Fishing Co., Inc. ("Amko") operated a fishing business utilizing its ship, the Deborah Ann, and a Hawaii Longline Limited Entry Permit (the "Fishing Permit"). At least two companies provided the Deborah Ann with supplies, H3O Communications, LLC ("H3O") and VAK Fisheries, LLC ("VAK").

At some point, Amko or its principal entered into an agreement with VAK and transferred the Fishing Permit to VAK. Despite the transfer, the Deborah Ann continued as the vessel associated with the Fishing Permit. Thus, Amko continued to fish and retained beneficial use of the Fishing Permit.

In Amko's chapter 7[1] case, the chapter 7 trustee abandoned the Deborah Ann and brought a fraudulent conveyance action against VAK to

[**] The Hon. René Lastreto II, United States Bankruptcy Judge for the Eastern District of California, sitting by designation.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

2

recover the Fishing Permit or its value. She then settled the lawsuit for a sum certain (the "Proceeds") and abandoned the Fishing Permit.

At issue in this appeal is whether H3O holds a claim secured by the Proceeds as a result of an alleged maritime lien and whether the bankruptcy judge should have recused. The bankruptcy court decided only a narrow issue and determined that H3O did not have a maritime lien that attached to the Proceeds. The bankruptcy judge did not recuse. We AFFIRM.

## FACTS

The bankruptcy court decided a discrete issue and did not make extensive factual findings. For our purposes, then, the story is gleaned from the bankruptcy filings.[2]

Amko filed a chapter 12 petition in April 2015.[3] The next month, VAK sought a "comfort" order confirming that the automatic stay did not apply to the Fishing Permit because, although it was still assigned to the Deborah Ann, Debtor's principal transferred it to VAK in 2012. VAK also sought stay relief to enforce a maritime lien against the Deborah Ann. The bankruptcy court eventually denied the motion.

---

[2] We exercise our discretion to take judicial notice of documents electronically filed in the bankruptcy case. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[3] Chapter 12 is reserved for family farmers and fishermen. 11 U.S.C. § 109(f).

Debtor later converted to a chapter 7 proceeding, and the chapter 7 trustee, Elizabeth A. Kane, promptly proposed to abandon the Deborah Ann "with complete longline gear and equipment[.]" Preservation, she explained, would be burdensome and there was little or no equity in the property—its scheduled value was $400,000 and possible liens totaled $324,951.23: the Dojin Shipping Agency for $46,860; H3O for $62,230.23; and VAK for $215,861.

VAK remained focused on the Fishing Permit. In response to the notice of abandonment it argued that, because the "Vessel and Fishing Permit are inextricably linked[,]" the bankruptcy court should clarify that the Fishing Permit also was abandoned. But the bankruptcy court did not accommodate this request; it eventually approved abandonment of the estate's interests in the Deborah Ann, "with complete longline gear and equipment . . . ." Its order did not reference the Fishing Permit.

The Trustee eventually brought an adversary proceeding against VAK, alleging that the Fishing Permit was fraudulently transferred. It resolved quickly through a proposed settlement agreement where VAK paid the Trustee $75,000 and the Trustee dismissed the complaint, released VAK, and agreed that the Fishing Permit would be deemed abandoned. H3O opposed the settlement, arguing that the price was too low. In reply, the Trustee emphasized that she was settling the fraudulent transfer claim, not selling the Fishing Permit. But she agreed to sell it to another buyer for

4

a higher price. Some delay followed, but after the potential buyer withdrew its offer, the bankruptcy court granted the Trustee's Rule 9019 motion and approved the settlement agreement.[4]

Apparently incentivized by the Proceeds, H3O filed a $47,826.74 proof of claim for "[g]oods and services provided for vessel to operate" and asserted that it was secured by a maritime lien. As subsequently became clear, H3O asserted that it had a maritime lien on the Deborah Ann and the Fishing Permit and, thus, that it was entitled to be repaid from the Proceeds.

The Trustee objected and sought to reclassify the claim from secured to general unsecured. She argued that she received money from settling the fraudulent transfer action, that she abandoned rather than sold the Fishing Permit, and that the Proceeds were not subject to any maritime lien.

Mid-way through oral argument at the hearing on the claim objection, H3O's counsel, apologetically, asked about the bankruptcy judge's partiality, noting that the bankruptcy judge had previously worked in the same firm as the Trustee's counsel. The bankruptcy judge explained that he took the bench fifteen years ago but acknowledged that when he was first appointed he recused himself from all cases involving his former firm. Then the bankruptcy judge, identifying the correct legal test, found

---

[4] At oral argument, H3O's counsel wrongly stated that the bankruptcy court interfered with the bidding process. It did not.

that no "reasonable person would come to the conclusion that at this point I'm unable to be fair to both sides." H3O's counsel never asked the bankruptcy judge to recuse.

Eventually, the bankruptcy judge sustained the Trustee's objection. He refrained from determining whether H3O had a maritime lien on the Deborah Ann or the Fishing Permit. He merely found that it did not have a generalized maritime lien against the estate given abandonment of the vessel, its equipment, and the Fishing Permit. He then noted that the Proceeds arose from a settlement, not a sale, and that the abandonment and release reinforced this point.

The bankruptcy court entered a separate order sustaining the claim objection, finding that H3O did not have a security interest in the Proceeds or an otherwise secured claim against the bankruptcy estate.

H3O timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Did the bankruptcy court err when it sustained the Trustee's objection to H3O's secured claim?

Did the bankruptcy judge err when he did not recuse?

## STANDARDS OF REVIEW

In the claim objection context, we review the bankruptcy court's legal conclusions de novo and its findings of fact for clear error. *Lundell v. Anchor Const. Specialists, Inc. (In re Lundell)*, 223 F.3d 1035, 1039 (9th Cir. 2000).

A finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quotation marks omitted).

Because H3O did not ask the bankruptcy judge to recuse, we review this decision for plain error. *United States v. Holland*, 519 F.3d 909, 911 (9th Cir. 2008).

We may affirm on any ground supported by the record, regardless of whether the bankruptcy court relied upon, rejected, or even considered that ground. *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).

## DISCUSSION

The bankruptcy court sustained the Trustee's objection to H3O's claim and reclassified H3O's secured claim as unsecured. In doing so, it concluded that H3O's maritime lien did not extend to either the bankruptcy estate in its entirety or the Proceeds.

**A.    The bankruptcy court properly reclassified H3O's claim as unsecured.**

We start with a discussion of relevant law.

**1.    The bankruptcy claim objection process governs and admiralty law is relevant.**

**The bankruptcy claims process.** A creditor asserts a claim in bankruptcy by filing a proof of claim. 11 U.S.C. § 501(a); Fed. R. Bankr. P. 3001, 3002. And a properly filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). If a claimant asserts a secured claim, its proof of claim must include evidence of perfection. Fed. R. Bankr. P. 3001(d).

Once a claim is filed, it is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). And if an interested party objects, the bankruptcy court, after notice and a hearing, must determine the amount of such claim and allow it accordingly. 11 U.S.C. § 502(b).

To overcome the presumption of validity, the objector must do more than formally object. *Lundell*, 223 F.3d at 1039. Instead, to "defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.' " *Id.* (quoting *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991)).

"If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to

prove the validity of the claim by a preponderance of the evidence." *Id.* (quoting *Ashford v. Consol. Pioneer Mortg. (In re Consol. Pioneer Mortg.)*, 178 B.R. 222, 226 (9th Cir. BAP 1995)). The ultimate burden of persuasion, thus, remains with the claimant. *Id.*

**Admiralty law and maritime liens.** "[M]aritime liens have extraordinarily little in common with land liens, including consensual security interests." *Walsh v. Placedo Shipping Corp. of Liberia (In re Pac. Caribbean Shipping (U.S.A.), Inc.)*, 789 F.2d 1406, 1407 (9th Cir. 1986). "Land liens and maritime liens are 'two unlike things . . . called by the same name.'" *Id.* (quoting G. Gilmore & C. Black, *The Law of Admiralty* 589 (2d ed. 1975)). *See id.* (discussing differences).

A "maritime lien is a privileged claim upon maritime property, such as a vessel, arising out of services rendered to or injuries caused by that property." 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 9-1 (5th ed.). As the Ninth Circuit explains:

> A maritime lien is "one of the most striking peculiarities of Admiralty law, constituting a charge upon ships of a nature unknown alike to common law and equity." *Black's Law Dictionary* 943 (8th ed. 2004) (quoting GRIFFITH PRICE, THE LAW OF MARITIME LIENS 1 (1940)). It has been defined as: "(1) a privileged claim, (2) upon maritime property, (3) for service done to it or injury caused by it, (4) accruing from the moment when the claim attaches, (5) traveling with the property unconditionally, (6) enforced by means of an action in rem." *Id.* (quoting PRICE at 1). The lien gives the creditor the right to

9

> appropriate the vessel, have it sold, and be repaid the debt from the proceeds of the sale. [*Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc).]

*Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1128 (9th Cir. 2008).

The Ninth Circuit recently considered the intersection of bankruptcy and admiralty law in *Barnes v. Sea Hawaii Rafting, LLC.* 889 F.3d 517 (9th Cir. 2018). There, an injured seaman commenced an *in rem* proceeding against a vessel and an *in personam* action against its owner (a company) and its principal; he sought to enforce his seaman's lien against the vessel for maintenance and cure. *Id.* at 523–25. Eventually, the company and its principal filed for bankruptcy. *Id.* at 526. The bankruptcy court approved the chapter 7 trustee's sale of the vessel, free and clear of any liens. *Id.* at 532.

Relevant to bankruptcy law, the Ninth Circuit held: first, that the automatic stay did not apply to the seaman's effort to enforce his maritime lien; and second, that the bankruptcy court lacked jurisdiction to adjudicate the maritime lien because the admiralty court had already obtained jurisdiction over the vessel. *Id.* at 532–33. It observed that, even if the "bankruptcy court had *in rem* jurisdiction over the [vessel], it is an open question whether bankruptcy courts have the effective ability to sell a vessel free and clear of maritime liens." *Id.* at 533 (internal quotation marks omitted). Nevertheless, it pointed to two well-established principles. *Id.* at 534. "First, a maritime lien accompanies the property into the hands of a

bona fide purchaser. It can be executed and divested only by a proceeding *in rem*." *Id.* (internal quotation marks omitted). And second, a "maritime lien cannot be extinguished except through the application of admiralty law." *Id.* As a result, there "are good reasons why a bankruptcy court, if it can release a maritime lien at all, should be required to do so pursuant to admiralty law." *Id.*

    2.    **The bankruptcy court did not err when it sustained the Trustee's claim objection.**

With some legal context, we now return to the bankruptcy court's decision. H3O filed a secured claim, which was prima facie evidence of its validity; the Trustee objected to the secured status and pointed to facts sufficient to rebut the prima facie validity; so the burden of persuasion as to H3O's secured status was on H3O. And the bankruptcy court determined only that at the time of the decision H3O did not hold a claim secured by settlement proceeds or other estate assets.

On appeal, H3O relies on a tracing argument intermixed with Code references. Its argument requires some unpacking: its maritime lien against the Deborah Ann attaches to appurtenances; the Fishing Permit was an appurtenance; the Trustee brought a fraudulent transfer action under Hawaii law to recover the Fishing Permit; the Trustee's settlement of the litigation was a recovery and the Trustee, in effect, elected under § 550 to receive monetary value instead of the return of the Fishing Permit;

11

recovery of a fraudulent transfer claim is estate property under § 541(a)(3); and "such recovery also remains subject to any security interest that attached to the original asset." That security interest, it claims, was its maritime lien.

We disagree; H3O has not shown that the bankruptcy court erred.

### a. The bankruptcy court did not extinguish H3O's maritime lien.

We start with what the bankruptcy court did not do; it expressly stated that it was not adjudicating H3O's maritime lien interest in either the Deborah Ann or the Fishing Permit. As a result, to the extent H3O had a maritime lien, the bankruptcy court did not extinguish it. This aligns with the Ninth Circuit's recent admonition that a "maritime lien cannot be extinguished except through the application of admiralty law." *Barnes*, 889 F.3d at 534. In the discussion that follows, we assume, without deciding, that H3O's underlying position that it had a maritime lien on both the Deborah Ann and the Fishing Permit is correct.[5]

The Trustee's abandonment of these assets also did not alter, affect, or extinguish H3O's maritime lien: when a Trustee abandons property, it leaves the bankruptcy estate subject to any preexisting interests, such as a

---

[5] The Trustee, for her part, asserts that H3O did not have a maritime lien on the Fishing Permit because it was transferred two years before H3O provided services to the Deborah Ann or because the Fishing Permit was not an appurtenance to the Deborah Ann. But the bankruptcy court did not so find; nor will we do so in the first instance on appeal.

12

maritime lien. Assuming the Fishing Permit is an appurtenance of the Deborah Ann,[6] the maritime lien could extend to the Fishing Permit.[7] And this could be true even if VAK owned the Fishing Permit but assigned it to the Deborah Ann.[8] In sum, after abandonment, H3O maintained its *in rem* maritime lien rights and the right to institute an action in admiralty to enforce them.

Finally, the fact that the Trustee settled a fraudulent conveyance action related to the Fishing Permit does not change this analysis. The fraudulent conveyance action did not involve the application of maritime law, and the settlement did not liquidate, diminish, or otherwise impact H3O's maritime lien rights. Instead, the Trustee stepped into the shoes of unsecured creditors when she pursued the fraudulent conveyance action. So to the extent H3O had an *in personam*, unsecured claim against Debtor and could have brought the fraudulent conveyance action outside of

---

[6] H3O concedes in its reply brief that determining whether something is an appurtenance is a fact-specific matter, *see* Appellant's Reply Brief at 10, so we would not be able to resolve that question for the first time on appeal.

[7] *E.g.*, *Bank of Am., NT & SA v. Pengwin*, 175 F.3d 1109 (9th Cir. 1999) (affirming an *in rem* sale of vessel with its fishing permits, but not otherwise engaging with the underlying question).

[8] *Gowen, Inc. v. F/V Quality One*, 244 F.3d 64, 69 (1st Cir. 2001) ("We have assumed, as appellants assert, that the [fishing] permits could in some circumstances be severed from the vessel upon its sale and retained by its old owner. But courts have repeatedly upheld maritime liens upon 'severable' equipment, including, surprisingly enough, equipment merely *leased* to the owner." (citing cases)).

bankruptcy, the settlement limited H3O's rights. But again, H3O's maritime lien rights remain unaffected by the bankruptcy proceeding and this settlement. Its lien did not attach to the Proceeds, it remained with the Fishing Permit after abandonment.

### b. H3O has not shown how or that its maritime lien entitles it to a preferred position with or priority distribution from the bankruptcy estate.

Even though H3O's maritime lien rights remain unaffected by the bankruptcy proceeding, it seeks, through this appeal, to improve its position by expanding the scope of its maritime lien: it wants a priority distribution from the Proceeds.

But, because maritime liens are secret liens, the Supreme Court, nearly a hundred years ago, cautioned against extending them. *Piedmont & George's Creek Coal Co v. Seaboard Fisheries Co.*, 254 U.S. 1, 4 (1920) ("The maritime lien is a secret one. It may operate to the prejudice of prior mortgagees or of purchasers without notice. It is therefore stricti juris and will not be extended by construction, analogy or inference.").

H3O has not shown that it is entitled to improve its position.

The bankruptcy court determined that H3O's maritime lien did not extend to the bankruptcy estate in its entirety. This was unquestionably correct.

Running through H3O's appellate brief is the assumption that because it has a maritime lien in the Deborah Ann and the Fishing

14

Permit—a finding the bankruptcy court did not make and that we, similarly, are agnostic about—it also has a secured interest in the entirety of Debtor's bankruptcy estate. But it has cited no authority saying that a maritime lien extends so expansively. Case law (including case law H3O cites) is to the contrary. As the Third Circuit wrote, in a slightly different context:

> [T]he law of maritime liens has consistently recognized that a maritime lien attaches only to the specific vessel to which services are provided. *See, e.g.*, 46 U.S.C. § 31342 (2004) ("[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner-(1) has a maritime lien on *the* vessel . . . .") (emphasis added); *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 4, 41 S.Ct. 1, 65 L.Ed. 97 (1920) ("[O]ne vessel of a fleet cannot be made liable under the [Federal Maritime Lien Act] for supplies furnished to the others, even if the supplies are furnished to all upon orders of the owner under a single contract."); *In re Container Applications Int'l, Inc.*, 233 F.3d 1361, 1365-66 (11th Cir. 2000) (following *Piedmont* and denying maritime lien because the purported lienholder did not provide necessaries to any particular vessel). The vessel-specific character of maritime liens results from the legal fiction that a vessel receiving services "is considered to be a distinct entity responsible only for its own debts." *Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd.*, 808 F.2d 697, 701 (9th Cir. 1987).

*PNC Bank Del. v. F/V Miss Laura*, 381 F.3d 183, 185–86 (3d Cir. 2004); *id.* at 187 ("Instead, maritime liens have consistently been limited to the specific vessel to which services were provided.").

So H3O's argument that § 541(a)(3) matters is a non-starter. Section 541(a)(3) simply states that property the trustee recovers under various Code sections is estate property. As a result, H3O is not entitled to a generalized secured claim against the estate; it has not persuasively shown that its *in rem* maritime lien against a vessel entitles it to a secured interest in the entire bankruptcy estate, a separate and distinct entity.

H3O's more specific appellate argument turns on a legal position that it has not established: its maritime lien extends beyond the vessel or its appurtenances to proceeds. It cites no case law supporting that premise. This is not to say H3O cites no legal authority about maritime liens attaching to proceeds; it does, but only in the context of an *in rem* action. As the court in *Trans-Tec Asia* explains, a maritime lien "gives the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds of the sale." 518 F.3d at 1128; *see* 46 U.S.C. § 31342(a) (granting a person who provides necessaries to a vessel a maritime lien and allowing that person to enforce the lien in a civil *in rem* action). *See also In re Muma Servs., Inc.*, 322 B.R. 541, 547 (Bankr. D. Del. 2005) ("The Maritime Lien Act provides that when a vessel is sold in an *in rem* action by order of a court of competent jurisdiction the maritime lien claims attach to the proceeds of the sale in accordance with their priorities."). But H3O did not bring an *in rem* action for sale of the Deborah Ann—or, for that matter, for sale of the Fishing Permit.

And maritime liens do not always attach to proceeds. For instance, when a vessel is entirely lost, the maritime liens on it are extinguished and do not attach to insurance proceeds. *Walsh v. Tadlock*, 104 F.2d 131, 132 (9th Cir. 1939) ("With the total destruction of the vessel the liens thereon were of necessity extinguished. These liens did not attach to the proceeds of the insurance, nor did appellants' lien on the boat per se entitle them to participate in the division of the insurance money." (citations omitted)).[9] Put differently, H3O erroneously assumes that maritime liens attach to proceeds in the same way that liens governed by the UCC do. *Walsh*, 789 F.2d at 1408 ("[I]n view of the lack of similarity between Article 9 consensual security interests and maritime liens . . . the U.C.C. should not be interpreted to apply to such liens . . . .").

So H3O has not carried its burden to prove that it has a secured interest in the Proceeds. As a result, the bankruptcy court did not err when

---

[9] *Compare* Bruce A. King, Ships As Property: Maritime Transactions in State and Federal Law, 79 Tul. L. Rev. 1259, 1326 n.337 (2005) ("The attachment of maritime liens to proceeds is a different matter. As discussed above, a maritime lien on unpaid freight does not attach to proceeds after the freight is paid."), *and* Robert J. Zapf, Appurtenances: What Are They and Are Fishing Permits Among Them?, 79 Tul. L. Rev. 1339, 1348–49 (2005) ("Indeed, even after freights have been paid over, there is authority that the freights may nonetheless be the subject of a maritime lien. At some point, of course, freights lose their character as such and become part of the general funds of the recipient and thus are no longer subject to a maritime lien. However, the lien attaches as long as the funds can be identified as freights."), *with*, *Cornish Shipping Ltd. v. Int'l Nederlanden Bank N.V.*, 53 F.3d 499 (2d Cir. 1995) ("Moreover, we have stated, in an older case involving a different type of lien on freights, that once a lien attaches to such funds, the lien follows the proceeds through all of their traceable transmutations . . . .").

it sustained the Trustee's objection to H3O's secured status.

And in any event, the Trustee did not sell the Fishing Permit. Instead, she brought a fraudulent conveyance action to recover the Fishing Permit but then settled it.[10] So H3O would have to additionally show that its secured interest encumbered the litigation or the Trustee's ultimate settlement recovery. It has not. And we again note that its maritime lien on the Fishing Permit, if any, remains in place; it did not attach to Proceeds and H3O is free to exercise lien rights notwithstanding the settlement.

H3O relies (for the first time on appeal) on *In re Figearo*, 79 B.R. 914 (Bankr. D. Nev. 1987). That case, it argues, held that funds recovered by a chapter 7 trustee on a fraudulent conveyance action are subject to a prepetition security interest, notwithstanding § 552(b). It asserts that the same conclusion should therefore be reached here and that its maritime lien must be deemed secured by the Proceeds.

We dispense with the easy part: H3O's maritime lien did not extend to the fraudulent conveyance litigation. *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 497 B.R. 403, 414 (Bankr. S.D.N.Y. 2013) ("[B]ecause the Debtor does not own the right to

---

[10] On H3O's read, the Trustee's settlement pragmatically worked a sale of the Fishing Permit, and thus we must treat it as if it were a § 363 sale of estate property and award it its secured interest. The Trustee disagrees. The bankruptcy court, for its part, interpreted its own order approving the transaction as a settlement and not a sale. That said, to the extent it was a § 363 sale, the sale was subject to any preexisting liens.

pursue a fraudulent transfer action in bankruptcy . . ., the Debtor could not have encumbered or assigned that right prepetition."). H3O does not argue this; nor could it reasonably do so, as its own authority establishes that H3O likely lacked a "proceeds" interest in the Trustee's fraudulent conveyance action. In *Figearo*, the bankruptcy court explained:

> The trustee's right to set aside the transfers, arguably contingent noncash proceeds, is created on the filing of the bankruptcy petition. Further, the trustee is generally the only party in interest with standing to pursue these rights. Although the trustee's rights are dependent on the nature of the transfer, they are not received upon the sale, exchange, collection or other disposition of collateral or proceeds. Therefore, the trustee's right to set aside a fraudulent transfer can not be considered proceeds under NRS 104.9306(1).

79 B.R. at 917 (citation omitted). While *Figearo* involves interpretation of Nevada's UCC, it underscores the main point: the Trustee accedes to general unsecured creditors' right to bring a fraudulent conveyance action, which the debtor cannot otherwise encumber.

Instead, H3O focuses on *Figearo*'s other holding: the trustee's recovery of property (or its value) under § 550 is subject to a properly perfected security interest in that property. *Id.* at 918 ("Having found that Haley's security interest does not attach to the trustee's right to set aside a fraudulent transfer but does attach to the recovered property, the court concludes that the funds held by the trustee as a result of the compromise of the fraudulent conveyance litigation is subject to Haley's security

19

interest.").

H3O states that it found no BAP ruling on the precise issue presented here or in *Figearo*; but, it says, other courts have followed *Figearo*, and we should do the same. H3O does not, however, address the cases that hold otherwise. As a different bankruptcy court in this circuit recently noted, *Figearo* "is contrary to the weight of authority and has not been followed by more recent cases." *Rund v. Kirkland (In re EPD Investment Co., LLC)*, No. 2:12-ap-02424-ER, 2018 WL 947636, at *10 (Bankr. C.D. Cal. Feb. 17, 2018) (citing cases and 5 Collier on Bankruptcy ¶ 552.02 (16th ed. 2017)). *See Grossman v. Durham Commercial Capital Corp. (In re Connolly Geaney Ablitt & Willard, P.C.)*, 585 B.R. 644, 653–54 (Bankr. D. Mass. 2018) (declining to follow *Figearo*); *In re Residential Capital, LLC*, 497 B.R. at 414. So H3O's reliance on *Figearo* is potentially misplaced. But we do not need to resolve this legal matter because, as noted above, the burden of persuasion was on H3O; it has failed to carry that burden.

### c.    This result does not contravene public policy.

Last, H3O argues that the bankruptcy court's decision was erroneous because it contravened public policy: the purpose of the trustee's strong-arm power is to protect estate assets for the benefit of creditors; here, it suggests, the Trustee was standing in H3O's shoes and was supposed to "protect H3O's right in the [Fishing] Permit." Appellant's Opening Br. at 28. It continues: "By holding that Trustee's settlement of the fraudulent

transfer claims somehow dissolved H3O's secured claim rather than preserving it, the lower court frustrated the purpose of the Trustee's powers." *Id.*

We disagree. The bankruptcy court did not dissolve or otherwise extinguish H3O's maritime lien. So to the extent H3O is correct and its maritime lien extends to the Fishing Permit, it should be able to pursue the Fishing Permit or the Deborah Ann or both.

**B.    The bankruptcy judge did not err by failing to recuse himself.**

On appeal, H3O also argues that the bankruptcy judge erred by not recusing himself under 28 U.S.C. § 455(a). But H3O never asked the bankruptcy judge to recuse, either by motion or at the hearing. Now, "[f]ailure to move for recusal at the trial level . . . does not preclude raising on appeal the issue of recusal under [28 U.S.C.] § 455." *Noli v. C.I.R.*, 860 F.2d 1521, 1527 (9th Cir. 1988). But if "no motion is made to the judge . . . a party will bear a greater burden on appeal in demonstrating that the judge . . . [erred] in failing to grant recusal under section 455." *Id.* (internal quotation marks omitted) (alteration in original).

Under 28 U.S.C. § 455(a), a bankruptcy judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). It thus "covers circumstances that *appear* to create a conflict of interest, whether or not there is actual bias." *Preston v. United States*, 923 F.2d 731 (9th Cir. 1991) (quoting *Herrington v. Sonoma*

21

*County*, 834 F.2d 1488, 1502 (9th Cir. 1987)). What's more, "a judge has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require." *Clemens v. U.S. Dist. Court for Cent. Dist. of Cal.*, 428 F.3d 1175, 1179 (9th Cir. 2005) (internal quotation marks omitted).

H3O alleges an appearance of impartiality because the Trustee's counsel and the bankruptcy judge were once name partners at the same law firm. H3O also faults the bankruptcy judge for not disclosing the information. We disagree. We "gauge appearance by considering how the conduct would be viewed by a reasonable person, not someone hypersensitive or unduly suspicious." *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1219 (9th Cir. 2014) (internal quotation marks and citations omitted). This is not a new type of alleged disqualification:

> This general standard contained in § 455(a) is not intended to be an invitation for judges to freely disqualify themselves whenever their impartiality is questioned on any ground. Testimony on this issue was given at the hearings before the House Subcommittee on the bill which became the new Section 455 and is reflective of the legislators' intent:
>
> > Prof. Thode. [T]he longer the judge is on the bench, the less the likelihood that the general standard [of Canon 3(c)(1), which became 28 U.S.C. § 455(a)] will require his disqualification because of his former association [as former partner or former associate with a lawyer appearing before him].

22

*Hauptmann v. Wilentz*, 555 F. Supp. 28, 31 (D.N.J. 1982) (alterations in original).

Here, the partnership relationship ended fifteen years ago.[11] We conclude that a reasonable person would not view this as creating an appearance of impropriety. *Local 338, RWDSU v. Trade Fair Supermarkets*, 455 F. Supp. 2d 143, 144 (E.D.N.Y. 2006) ("There are a number of recusal cases involving judges' former law firms, and it is rare that recusal is granted based only on a question of impartiality because of the judge's former affiliation.").[12] So we determine that the bankruptcy judge did not err, much less commit plain error, by either failing to disclose the former relationship or by not *sua sponte* recusing himself.

### CONCLUSION

Based on the foregoing, we AFFIRM.

---

[11] The bankruptcy judge, who is in his second 14-year term, stated that for a period of time he recused from all cases involving his former firm. That is a standard practice. *See Smith v. Pepsico, Inc.*, 434 F. Supp. 524, 526 & 526 n.3 (S.D. Fla. 1977) (noting the practice but commenting that "[t]here is a paucity of reported decisions setting forth recusal periods in various districts").

[12] *Webb v. White*, No. 2:15-CV-00512-DN-PMW, 2015 WL 6395611, at *3 n.42 (D. Utah Oct. 22, 2015) (listing cases where disqualification was not required when the judge's former partner or law firm appeared: 15 years, 13 years, 6 years, and 3 years later).